**MORMINO v. LEON HESS, Inc.**

United States District Court,
S. D. New York.

Feb. 11, 1953.

Robert Emmet Connolley, New York City, for libelant.

Frederic H. Cunningham, New York City, for respondent.

LEIBELL, District Judge.

The libel in this action was filed on October 20, 1949. It set forth two causes of action: (1) that libelant was injured as a result of negligence of the respondent, and is entitled to a judgment for the damages he sustained; and (2) that he is entitled to maintenance until he received the maximum cure for his injuries. At the trial libelant was permitted to amend the first cause of action so as to include a claim that his injuries resulted from the unseaworthiness of the vessel. In its answer respondent pleaded a defense of contributory negligence.

At the trial libelant, Mormino, was the only live witness called by either side. Respondent rested its case after offering in evidence several exhibits, including the deposition of Hans Anderson, Chief Mate of the vessel on which libelant sustained certain injuries on June 29, 1948.

At the time he was hurt Mormino was chief pumpman aboard the S. S. David T. Wilentz, a Liberty tanker, owned and operated by the respondent. He signed on the vessel at Norfolk, Virginia, on May 28, 1948. From Norfolk they proceeded to Texas where a cargo of oil was taken on. From there they proceeded to Port Alfred, Canada (on the Saguenay River), where its oil cargo was discharged. The vessel remained at Port Alfred three days. On June 21, 1948, she left on a return voyage to Houston, Texas.

The log shows that the tanker finished discharging cargo at Port Alfred, Canada, at 3:40 a. m. on June 21, 1948; that the cargo hose was disconnected ten minutes later; and that the tanker left the dock at 4:25 a. m. She passed out of the Saguenay River and entered the St. Lawrence at Tadoussac at 9:30 a. m. on that day. The ship sailed down the St. Lawrence and passed Cape Gaspe at 7:10 a. m. on June 22nd. She proceeded in an easterly direction across the Gulf of St. Lawrence, passed Ingonish—Cape Breton Island, at 2:14 a. m. on June 23rd and was out in the Atlantic at 6:15 a. m. headed on her trip south along the coast. On that day the Chief Mate, Hans Anderson, drew Mormino's attention to a leaking manifold valve located forward, on the main deck, alongside the No. 2 port deep tank. He told libelant to repack the gland of the valve at his convenience. When Mormino was shown the leak, about a quart of heavy oil had collected on the deck, covering an area about eight inches in diameter. Six days later, on June 29, 1948, Mormino, in an attempt to fix the valve, stepped in the oil which had accumulated there and fell. At that time the amount of oil on the deck had increased to about a gallon, and covered an area about two feet square.

The weather was fine and clear all afternoon on June 23rd and the next morning, June 24th. On the afternoon of June 24th there were rain squalls and

a rough head sea with the vessel pitching moderately. The following morning, June 25th, the weather was about the same but it cleared in the afternoon. It was fine and clear all of Saturday, June 26th; clear and partly cloudy the next day, the 27th, and on Monday, June 28th. There is an entry in the log— 9:30 a. m. on Tuesday, June 29th that "L. Mormino, Ch. Pumpman, fell on oily deck while working on Port Manifold abrasing both arms and back"; and at 10:50 p. m., that the pumpman was lowered safely aboard a Coast Guard vessel. He was taken to a government hospital at Key West, Florida.

Libelant charges that the discharge valve was unseaworthy, in that it leaked soon after the vessel left Port Alfred, and that the vessel was further unseaworthy in that there were no drip pans available to catch the leaking oil, that there were no flanges available to cover the mouth of the valve, and that there was neither sand or sawdust available to cover the oil patch on the deck. Libelant also charges that the defendant was negligent in failing to have the oil removed from the deck, and that this negligence resulted in his injury.

The respondent denies that the vessel was unseaworthy when it left Port Alfred, or that respondent was guilty of any negligence. Respondent contends that it was Mormino's duty as chief pumpman to maintain the valve in good condition, and that his failure to make any effort for six days to fix the leak constituted contributory negligence, of a type sufficient to preclude him from successfully maintaining this action. Respondent also asserts that libelant was hurt while performing a task calculated to eliminate the very condition which caused the injury, and that under those circumstances his injuries are not subject to indemnity. In addition, respondent alleges that Mormino, himself, should have cleaned up the oil and that in failing to do so and in stepping into the oil he was contributorily negligent.

A shipowner has a duty, at the commencement of a voyage, to furnish his employees with a vessel that is seaworthy in itself, and seaworthy as respects its appurtenances and appliances. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Cortes v. Baltimore Insular Line, 287 U.S. 367, 370, 53 S.Ct. 173, 77 L.Ed. 368; O'Donnell v. Great Lakes Co., 318 U.S. 36, 40, 63 S.Ct. 488, 87 L.Ed. 596. This is a continuing duty and the vessel and its appliances must be maintained in seaworthy condition throughout the course of the voyage. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. No proof was introduced on the trial to show that the valve in question was unseaworthy when the vessel left Port Alfred but the fact that the leak developed so soon after leaving port would warrant the conclusion that the valve was defective at that time. The Southwark, 191 U.S. 1, 8, 24 S.Ct. 1, 48 L.Ed. 65. Assuming that the manifold valve on the discharge line was in good condition when the vessel left Texas, something must have happened while the oil cargo was being discharged through this manifold at Port Alfred, because the leak developed soon thereafter. If the unseaworthiness was one proximate cause of the seaman's injury and his own negligence was another proximate cause, he must stand his proper share of the damages he sustained from the injuries. McGhee v. United States, 2 Cir., 165 F.2d 287; Stokes v. United States, 2 Cir., 144 F.2d 82.

It was part of Mormino's duties as the chief pumpman to look after the manifolds. He could have done the job on the afternoon of June 23rd or the next morning, when the weather was fine and clear. As has been indicated the weather was also clear on the afternoon of June 25th and on Saturday, the 26th. He could have done the job on any of those days. In fact there were only two days of the voyage from Port Alfred when the weather was at all rough; on the afternoon of the 24th and on Friday, the 25th. The log contains no entry of strong winds or high seas. Mormino neglected this repair job and permitted gummy oil to accumulate under the mani-

fold from the slow leak in the valve. His other work in the pumproom would not have prevented him from taking enough time out to repack the manifold valve.

▮ There is no controversy in respect to respondent's assertion that it was libelant's duty as chief pumpman to fix the faulty valve. But Mormino was under no duty to clean the oil from the deck while it was accumulating. An employment agreement (Ex. 4) reached by various tanker companies (including Keystone Shipping Co., the agent for the S. S. David T. Wilentz) and the National Maritime Union of America, of which Mormino was a member, provides in Section 71 that—

"Pumpmen's duties shall consist of handling fuel oil, ballast, cargo, and tank cleaning equipment and all work necessary for the maintenance and operation of cargo pumps, auxiliaries, general cargo lines, and all deck machinery. He shall not be required to chip paint, scale paint, polish brass, or do any work that is not considered maintenance of the machinery under his care. However, the pumpman may, at his own discretion, paint the cargo pumps only. He shall not be required to make heavy installations where this work is customarily done by shore gangs. This, however, shall not be construed to apply to renewals and replacements of wornout equipment."

Section 27 which relates to a maintenance mechanic-second pumpman specifies in part that—

"* * * he shall not be required to chip, scale, paint or do any general cleaning."

Cleaning oil from the deck would fall under the heading of "general cleaning". Although the limits of a chief pumpman's duties are not as explicitly described as are those of a second pumpman, he could not be required to remove oil from the deck. The deposition of the Chief Mate, Anderson, shows it was Anderson's duty to see that the deck crew kept the decks in a safe condition. The deck crew of ten men was under Anderson's command. Anderson admitted that at no time had he ordered any one of them to clean up the oil. It was the deck crew's job to do this. Becker v. Waterman S. S. Corp., 2 Cir., 179 F.2d 713.

▮ Libelant intimates that the Mate's suggestion that he fix the valve at his own convenience excused his delay. I do not see it that way. It was part of Mormino's job to repair the valve, irrespective of any order of the Mate. One obligated to perform a certain act performs it at the time he deems proper, but always within such time as to completely fulfill his duty, considering all the surrounding circumstances.

Respondent also argues that libelant's obvious neglect to perform his duty within a reasonable period of time permitted the enlargement of the hazardous condition which became the cause of Mormino's accident. According to respondent this is such negligence as falls within the ruling of the Court of Appeals for this Circuit in Walker v. Lykes Bros. S. S. Co., 2 Cir., 193 F.2d 772, and operates as a complete bar to libelant's action.

The case at bar is distinguishable on its facts from the Walker case. In the latter, libelant's injuries resulted directly from his neglect of duty. He was supposed to see to it that a filing cabinet drawer was repaired. He was neglectful. The drawer opened and caused his injury. In the instant action the sequence of events is different. The negligence of another party intervened between Mormino's neglect and his injury. As has been stated heretofore, Mormino's duty was limited to repairing the valve. It did not extend to the consequences of his delay in making that repair, namely to cleaning the oil from the deck. That was for some member of the deck crew to do.

▮ Nor is libelant barred from maintaining this action because he sustained his injuries in the performance of an act designed to remove the condi-

**318**

tion which caused his injuries. In relying on such a proposition respondent impliedly invokes the doctrine of assumption of risk, Becker v. Waterman S. S. Corp., 2 Cir., 179 F.2d 713, a defense which is not available in a suit brought under the Jones Act. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265.

The morning of June 29th was sunny and clear. Mormino admits that he saw the oil patch and that he stepped into it. He said he had to do so in order to make the repair. He testified that when he went to repair the manifold valve he spoke to the Chief Mate about the oil patch and asked for some sawdust to put on it, but was told to go ahead and was threatened with being logged. The Chief Mate in his deposition denied any such occurrence and further testified that there was sawdust and sand within 25 feet of the manifold, if Mormino was looking for any. I believe the Chief Mate. The testimony of Mormino that he warned the Chief Mate twice that the leaking oil presented a hazard, sounds too much like a sea-lawyer and not what a pumpman would say. Likewise, I do not believe Mormino's testimony that there was no flange or other part to use in repairing the broken valve. If he knew that, and if the repair was a shipyard matter, as he stated at the trial, it is strange that he should go to the manifold with tools in his hands to make the repair on June 29th. Further, I am not convinced that Mormino had to step into the oil in order to make the repair. The testimony of the Chief Mate, Anderson, and the sketch he drew, would indicate that there was space around the manifold that was not covered by the oil patch, from which Mormino could have approached the repair job.

I am of the opinion that libelant's own negligence in starting to make the repair without first having put some sand or sawdust on the oil patch, and his negligence in deliberately stepping into the oil as a result of which he slipped— that libelant's own faults were greater than respondent's. The fact that the tanker was unseaworthy in respect to the manifold valve and the respondent's negligence in not having previously cleaned up the oil patch, were also faults, but were less than libelant's. The respondent's faults compared with the libelant's faults would be as 1 to 3, and libelant is entitled to recover only one-third of his actual damages from respondent. See Guerrini v. United States, 2 Cir., 167 F.2d 352 at page 356.

The injuries Mormino received as a result of the fall aboard ship on June 29th were not too serious, fortunately. According to the medical report of the U. S. Naval Hospital at Key West, Florida, he cut his left elbow and received an incomplete fracture of the anterior segments of the sixth and seventh ribs. By July 8th the elbow wound was healing well and the motion of the elbow was gradually increasing, and the tenderness and pain in the left chest wall had gradually decreased, so that pressure strapping was discontinued. None of his injuries resulted in any permanent disability, except a five percent functional disability of the left elbow.

Mormino was permitted by the Navy hospital authorities at Key West to visit the town for recreation and to call at the respondent's agent's offices, to arrange for transportation to New York. According to Mormino he had previously asked to have respondent's agent visit him at the hospital and make the necessary arrangements there, but to no avail. Mormino testified that he went to Key West on a Saturday, July 10th, and that when he called at the agent's offices, at 2 p. m., they were closed. The hospital entries of July 10th show that Mormino had been out on leave on July 9th, a Friday, and was brought back badly beaten on that same night, July 9th. He was in the hospital receiving treatment for those injuries on Saturday, July 10th. The Key West hospital record contains the following entry, under date of 7/10/48. "Last night the patient was on authorized liberty. He states that while he was down town he was slugged

and robbed by two sailors in an unprovoked assault. The patient was brought into the hospital by taxicab". A note to the report states: "This patient was permitted to go on liberty on 9 July for recreation and to arrange transportation with company representative pending expected discharge early this week". As a result of the assault Mormino received a simple fracture of the skull, a fractured nose and lacerations of the face.

The discharge statement of the Navy Hospital also refers to "the night of July 9, 1948" as the night on which libelant "was beaten and robbed by two men". But even if we assume that he did call at the offices of the company's agent at 2 p. m. of the afternoon he was in Key West and found them closed, he could have returned to the hospital at that time. Instead he walked around the town, went to a movie, had something to eat, and then visited a night club where he met two United States sailors. He bought them a couple of drinks. They went to another night club and he bought them some more drinks. Mormino testified that they volunteered to show him where he could get a bus back to the hospital. After walking a short distance they forced him into a lot, beat him severely, and tried to rob him. On July 13th Mormino was flown to New York at the request of the Key West Hospital and became an in-patient at the Marine Hospital at Staten Island until August 2nd.

Counsel for libelant argues that if respondent's agent had answered Mormino's telephoned requests or had kept his office open and had been there to see plaintiff when he called that afternoon at 2 o'clock, the libelant would not have suffered the beating he received from the sailors that same evening at 11 p. m. There is no causal connection whatsoever between the two incidents. Further, there is no causal relationship between the beating Mormino received in Key West on July 9th at the hands of the sailors and his accident aboard the ship on June 29th. DeZon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065; Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082.

The attempt to saddle this defendant with libelant's July 9th injuries is without any legal precedent. Libelant at the time was not a member of the crew of any vessel. He was not subject to respondent's orders. He was not on shore leave. He had no vessel to return to. He was a hospital patient, well enough to be permitted to go to town.

During the months of October and November 1948, he secured work for three weeks as a bartender and he worked an additional three weeks in a hotel. His total wages from this period of employment amounted to about $350. He claims that at that time he suffered from pains in his heart as well as dizzy spells. The latter he attributes to the beating received about the head at the hands of the sailors. He states that he was unable to procure sea duty in Norfolk, Virginia, or in New York, and it was not until March of 1949 that he felt sufficiently well to return to sea. On March 9, 1949, he shipped aboard the S. S. Pioneer Gem.

Respondent's Exhibit D shows that, since his injuries, Mormino has been employed aboard ships as follows:

| | |
|---|---|
| S.S. Pioneer Gem | — March 9, 1949 to August 14, 1949 |
| S.S. Exilona | — January 13, 1950 to March 22, 1950 |
| S.S. Flying Cloud | — June 2, 1950 to August 3, 1950 |
| S.S. Barney Kirschbaum | — January 29, 1952 to September 2, 1952 |

No explanation was offered as to why libelant did not work from August 4, 1950 to January 28, 1952. Since the accident he has served in a capacity below his regular rating. His rating as a chief pumpman meant a salary of $285 per month, plus overtime. As a fireman, the capacity in which he later shipped,

he received a salary of $226 per month, plus overtime.

I calculate libelant's damages resulting from the injuries he received on June 29, 1948, as follows:

For pain and suffering........ $3,000.00
Loss of earnings from August 1, 1948 to March 1, 1949, seven months at $350.00 a month, say $2500.00 (less $350.00 earned during that period) of which no more than ½ should be charged against the June 29, 1948 injuries (½ of $2150.00)   1,075.00
Impairment of earning capacity because of the 5% limitation of the movement of his elbow   2,500.00
                                          ──────────
                                          $6,575.00
Of that total of $6,575.00, only one-third is chargeable to the respondent's negligence, because libelant's contributory negligence was so much the greater ....................   $2,192.00

An award for maintenance at the rate of $6 per day is sought from June 29, 1948 to March 9, 1949, when Mormino next shipped out, except for the time that he was in the hospital (June 29, 1948 to August 2, 1948) and the time during which he was employed as a bartender and hotel clerk (six weeks).

When libelant was discharged from the United States Public Health Service Hospital at Staten Island, New York, on August 2, 1948, a convalescence of four weeks was recommended. He was subsequently examined by respondent's doctor, Dr. Charles T. Russell, who on August 25th extended libelant's period of convalescence to September 20, 1948.

 A seaman is entitled to maintenance and cure when he incurs injury in the service of his ship. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. The respondent has paid Mormino $126 for maintenance. At the rate of $6 a day that would cover 21 days—3 weeks. His convalescent period, after he left the Staten Island Hospital on August 2nd, was extended to September 20th. If all of that period were chargeable to the injuries he received aboard ship, it would mean an additional four weeks of maintenance. He did not go back to the hospital for further treatment. The maximum of his cure from both sets of injuries, those he received June 29th and those of July 9th, was reached on September 20, 1948. The July 9th injuries were the more serious. Nevertheless, I will allow him an additional four weeks maintenance, 28 days at $6 a day ($168) for the injuries he received in the accident he sustained aboard ship on June 29, 1948, because some part of his June 29th injuries had not received their maximum of cure until September 20th.

Libelant is entitled to judgment on the first cause of action for the sum of $2,192 and on the second cause of action for $168, a total of $2,360, and his legal costs.