## DIXON  v.  UNITED STATES.

United States District Court,
S. D. New York.
March 23, 1954.

Jacob Rassner, New York City, for libelant.

J. Edward Lumbard, U. S. Atty., New York City (Kirlin, Campbell & Keating, New York City, Raymond Parmer and Vernon Sims Jones, New York City, of counsel), for respondent.

WEINFELD, District Judge.

Libelant Dixon, former chief mate of the S.S. Halton R. Carey, seeks recovery for severe and permanent injuries sustained by him aboard the vessel when several top rungs of a ladder on which he was descending gave way and he fell a distance of more than 20 feet to the deck of a lower hold. The respondent concedes the ladder was defective and in an unsafe condition at the time of the accident. But it resists liability for unseaworthiness [1] upon the ground that it did not furnish the defective ladder to libelant for his use. Respondent maintains that libelant had been ordered by the captain to inspect the very ladder which proved defective to see if repairs had been made by shoreside workers and thus the ladder had been withdrawn from use until it could be determined by libelant that it was, in fact, seaworthy. However its various contentions are phrased, the respondent in substance seeks to defeat recovery by Dixon upon the defense of assumption of risk—to use its language—"a risk resulting from the non-performance of a duty consciously assumed as a term of the employment."

The essential facts, with one exception, are not in dispute. On November 15th, 1951, the S.S. Halton R. Carey was discharged of coal by Danish stevedores while moored at Aalborg, Denmark. As a result of this operation the three bottom rungs of the aft ladder in the No. 2 hatch, which ran from the 'tween deck to the lower hold, were damaged by a clam shell dredge. One of the rungs was entirely out and the other two were bent and broken. Dixon reported this damage to the captain and agent and was advised that the rungs would be replaced and repaired. The next day, the day of the accident, Dixon examined and used the ladder on two occasions, once at 9:00 a. m. and again at 1:00 p. m. On this latter occasion he went down the ladder in the company of the gas house foreman to show him the rungs which required repair. At both times Dixon found that all but the three bottom rungs were in good condition. With the exception of the damaged bottom rungs, the ladder remained in a safe condition at least up to the time Dixon went ashore, sometime between 2:00 and 2:30 p. m. Soon after he left, shore workmen, engaged for the purpose, undertook to fix the ladder. The foreman of the shore repairmen, speaking through an interpreter, reported to Second Mate Nasta, who was in charge in Dixon's absence, that the three bottom rungs had been repaired but that other rungs, unspecified, were also in need of repair. Nasta made no inspection but directed that the required work be done. Dixon returned to the vessel about 4:30 p. m. and soon joined the second mate and the captain at dinner.

The major factual conflict concerns what was said by Dixon and Nasta at dinner. Dixon testified that he asked Nasta if the required repairs had been made to the ladder in the No. 2 hold and that Nasta replied that he did not

1. Libelant withdrew his claim of negligence under the Jones Act, 46 U.S.C.A. § 688.

know because he hadn't checked, but he did know that the repairmen had worked down there. The second mate's version, as it appears in a deposition and as it is supported by the captain at the trail, is somewhat different. He states that he told Dixon of his instructions to the foreman to fix such additional rungs as required repair—that is, other than the three bottom ones—but he did not know whether they had been repaired. Dixon, who impressed me as a forthright and truthful witness, testified on cross-examination that he did not recall that anything had been said about extra rungs, but would not deny Nasta's testimony on this subject when it was read to him.

In any event, the captain directed to Dixon to "check" the ladder. After first attending to other duties, Dixon proceeded down the No. 2 aft ladder from the 'tween deck to the lower hold. The ladder was approximately thirty feet long and the rungs were about fourteen inches apart. When Dixon's hands were on the third or fourth rung from the top and his feet four or five rungs below, the rung at his feet gave way. With his weight thus transferred entirely to the rung to which he was holding, that yielded, too; and, as Dixon fell, four or five other rungs at which he clutched to stop his fall also gave way. He crashed to the deck. The rungs which came out were among those which Dixon upon his two earlier inspections of that day had found in good condition. The parties appear to be in agreement as to the cause of the upper rungs' defects. In replacing the three lowest rungs, the repairmen had cut the new rungs too long and by forcing them in had spread, or sprung, the two uprights to such an extent that the welds on some of the upper rungs were loosened.

It is upon these facts that the respondent seeks exoneration from liability for the unseaworthy condition of the ladder. The respondent seeks to carve out an exception to the doctrine of seaworthiness so as to make it inapplicable to a seaman who is ordered to inspect equipment to ascertain whether repairs have been made. Respondent assimilates Dixon's status to that of a repairman or shoreside mechanic specially engaged to restore an admittedly defective appliance to a seaworthy condition. Neither the facts nor the law support its position. I hold on this record that libelant was neither warned of a dangerous condition nor did he know or have reason to believe that those upper rungs which gave way were grossly defective; but even if he did know, he did not in the performance of his duties assume the risk of unseaworthy appliances.

The respondent relies heavily upon Bruszewski v. Isthmian S.S. Co., 3 Cir., 163 F.2d 720 and Byars v. Moore-Mc-Cormack Lines, Inc., 2 Cir., 155 F.2d 587. Factually, I do not believe these cases are apposite. In both instances the employees, both of them shoreside, were engaged to repair the condition which was the direct cause of the injury and were warned or chargeable with knowledge of the dangers. The defective condition was obvious and notorious.

Here the condition was latent and unknown.[2] Further, Dixon was under instructions to inspect repairs believed to have been made by those hired to do the job. Dixon, as a member of the crew, had no alternative but to obey the captain's orders. Unlike a shoreside repairman come aboard ship, he was subject to the iron discipline of the sea, and was obliged to obey orders, even though required to work under unsafe condi-

2. In the Bruszewski case the Court of Appeals in its opinion noted the "obvious danger" of the broken boom which caused libelant's injuries, and commented: "Very different is this from the situation presented in Seas Shipping Co. v. Sieracki [328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099], * * * where the plaintiff suffered injury as a result of a defective appliance which appeared otherwise." 163 F.2d at page 722.

Cf. Mollica v. Chilean Line, D.C.S.D. N.Y., 107 F.Supp. 316, 318, affirmed sub nom. Mollica v. Compania Sud-Americana De Vapores, 2 Cir., 202 F.2d 25.

tions.[3] In complying with the captain's orders to inspect the ladder, Dixon was required to use it. This is so whether the "check" was to be made by jumping on the rungs while holding on to those known to be good, or by using a hammer to determine whether each rung had been welded properly. In any event, even were we to assume that which the evidence does not warrant—that he used the ladder knowing that the upper rungs were defective—this would not give rise to the defense of assumption of risk. At most, it would be an element to be considered in applying the rule of comparative negligence.[4]

■ Our own Court of Appeals in Becker v. Waterman S.S. Corp., 2 Cir., 179 F.2d 713, 714, was careful to limit the effect of the Byars case to the situation of a repairman of an independent contractor injured by that which he was to repair. In doing so the Court adopted a rationale which I believe defeats the defense in this case. The appellant in Becker contended that no recovery could be had " * * * because the chief officer [plaintiff] was under a duty to correct a dangerous condition of which he had knowledge, and sustained his injuries by reason of the very condition he was employed to correct." The Court

held that Byars was not applicable because assumption of risk was not a defense to an action under the Jones Act.[5] And, of course, the Jones Act but applies the firmly engrained admiralty rule that assumption of risk is no defense to a seaman's action based on the maritime doctrine of unseaworthiness.[6] Speaking of such unseaworthiness cases, the Supreme Court has said: "And no American case appears to have recognized assumption of risk as a defense to such a suit. In numerous cases this defense was either denied or ignored in circumstances plainly calling for its application had it been available."[7]

Moreover, the whole drift of the law has been away from the result urged here by respondent. The Supreme Court since its historic decision in the Osceola case[8] has steadily expanded the doctrine of seaworthiness to others than the immediate members of the ship's crew. In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, its benefits were extended to longshoremen working on board ship. More recently, in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, it was extended still further to cover a repairman of an independent contractor who had come on board ship. And in the latter case it

---

3. Darlington v. National Bulk Carriers, Inc., 2 Cir., 157 F.2d 817; Masjulis v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 31 F.2d 284; Reskin v. Minnesota-Atlantic Transit Co., 2 Cir., 107 F.2d 743; Storgard v. France & Canada S.S. Corp., 2 Cir., 263 F. 545.

4. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 432, 59 S.Ct. 262, 83 L.Ed. 265; cf. The Julia Fowler, D.C.S.D.N.Y., 49 F. 277; Olson v. Flavel, D.C.Or., 34 F. 477.

5. Recently in Kulukundis v. Strand, 9 Cir., 202 F.2d 708, the Court commented on the Bruzewski case: "We think the Third Circuit's holding that the doctrine of seaworthiness was inapplicable turned upon the fact that the longshoremen were employed for the very purpose of removing the unseaworthy condition which subsequently resulted in the injury, and therefore had no right to rely

upon the vessel's seaworthiness." Id., 202 F.2d at page 710.

6. Beadle v. Spencer, 298 U.S. 124, 129, 53 S.Ct. 712, 80 L.Ed. 1082.

7. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 429, 59 S.Ct. 262, 265. See also, e. g., Mahnich v. Southern S.S. Co., 321 U.S. 96, 103, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 93, 66 S.Ct. 872; Sanford v. Caswell, 5 Cir., 200 F.2d 830; Read v. United States, 3 Cir., 201 F.2d 578.
   In the Byars case the theory of unseaworthiness was never litigated or raised on appeal. Perhaps accounting for this is the fact that Seas Shipping Co. v. Sieracki, supra, extending the doctrine beyond actual seamen, was not handed down by the Supreme Court until after argument was heard in the Court of Appeals in Byars.

8. 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

flatly rejected a specific request that it reverse its holding in the Sieracki case.

It would be a rather anomalous development in general maritime law if the traditional rights of a seaman were contracted while those of shoreside longshoremen and repairmen were steadily expanded. This would be action counterclockwise to the recent rulings of the Supreme Court. To carve out an exception to a shipowner's liability to his crewmen for unseaworthiness based upon assumption of risk would be vitalizing a defense which the Supreme Court has consistently rejected through the years.[9]

■ There remains the question of whether Dixon was guilty of contributory negligence. As already shown, earlier on the day of the accident, first he, and then he and another, had used the ladder without mishap. Clearly, they avoided the bottom three rungs known to them to be in a state of disrepair. On these occasions all other rungs were inspected and found in good condition. Then followed the activity of the repairmen in the absence of Dixon and later the captain's order to "check." The captain had no reason to assume that in carrying out his order Dixon would not use the ladder. Neither the captain nor the second mate warned Dixon of a dangerous condition in other rungs. Indeed, he could not have been so warned because they did not know that the upper rungs of the ladder had been sprung by the repairmen in the process of correcting the original three. It is true that Nasta did mention the report of the repair foreman that other rungs had required attention and also his direction that these, too, be repaired. But this is far from warning Dixon that it was hazardous for him to make the inspection by using the ladder just as he had earlier in the day and before any repair work was undertaken. The reference to the other rungs appears to have been casual. The captain acknowledges that he did not inform Dixon of any specific damage to the ladder. Having been advised that the lowest three rungs had been mended and any further repairs probably completed, Dixon was warranted in assuming that the condition of the ladder was as good as it had been prior to repairs. Under all the circumstances, it cannot be said that Dixon failed to exercise reasonable care for his own safety by making the "check" by use of the ladder. It is not without significance on the issue of contributory negligence that after Dixon's fall, the captain and the second mate started down the very ladder from which Dixon fell, but were warned off by him. It was only then that they used the forward ladder.

Accordingly, I find that libelant is entitled to damages without diminution for contributory negligence.

■ We turn now to the question of damages. Dixon suffered multiple fractures in both legs. These included compound comminuted fracture of the right tibia, fracture of the lower shaft of the right fibula into the ankle joint, comminuted fracture of the right oscalcis, and comminuted fracture of the left tibia. The permanent injuries include the limitation of movement of both ankles and feet: the loss of use of the right foot is 75%, and of the left foot 60%; loss of mobility of the right ankle joint is 50%, and of the left ankle joint 45%. The right ankle joint and heel bone are deformed. The right leg is one-half inch shorter than the left, the shortening being between the knee and the ankle.

---

9. Mahnich v. Southern S.S. Co.; 321 U. S. 96, 64 S.Ct. 455; Socony-Vacuum Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262; Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712; The Arizona v. Amelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075.

Walker v. Lykes Bros. S.S. Co., 2 Cir., 193 F.2d 772, cited by respondent, has no application to the facts here. In that case the Court held that a master could be barred from recovery under the Jones Act because he was injured by a defective condition which he had failed to repair and which constituted breach of a duty owed his employer. Here Dixon did not fail to fulfill a duty owed his employer—on the contrary, he was in the process of carrying one out.

Dixon remained in the hospital at Aalborg, Denmark, from November 16th to December 13th, 1951, when he was flown to the United States. He was then hospitalized at the Marine Hospital at Staten Island from December 14th, 1951 to May 1st, 1952. Thereafter, he reported as an out-patient until September 16th, 1952, but has had no treatment since. A bone graft operation is indicated to the ankle joints, which, if successful, would result in a stiffened gait.

Dixon has necessarily been unemployed by reason of his injuries for a period of approximately two years. His base pay and overtime as chief mate on board the S.S. Carey was $600 per month. Loss of wages to the date of trial amount to approximately $14,000.

We next consider prospective loss of earnings. Dixon is now 43 years of age and his life expectancy is approximately 25 years. But it does not follow that his "work-life" expectancy is equal to his life expectancy. Considering the nature of his employment, a fair estimate of his "work" expectancy is 20 years. Dixon presses hard that the base figure to be used in determining future loss of earnings is that of a master's pay, $14,500 per year, although he has never been so employed, on the theory that his record indicated eventual promotion. While it is true that he was highly regarded by his employers, there is an element of conjecture in this. Moreover, to be balanced against possible promotion are normal work interruptions, hazards of economic dislocations during the period of work expectancy, and other factors incident to sea employment. Admittedly, no precise figure can be reached. I believe that $8,000 per annum represents a sound average figure of libelant's projected earning capacity during the period of his "work-life" expectancy.

But it is acknowledged that Dixon has an earning capacity in shoreside activities, although no evidence as to his likely earnings was offered by either side. Dixon has been at sea since he was 17. Although his formal education was meagre, he worked his way up through the ranks and was licensed as a master in September, 1949, for all oceans and tonnage unlimited. Dixon's injuries are such that he can never again follow the sea as a calling. Considering, however, his training, experience, and demonstrated capacity for self-improvement, I am of the view that he is capable of earning $250 to $300 a month, which must be deducted from the $8,000 figure, thus leaving a net diminution of earning capacity between $4,400 to $5,000 per year.

The present value of an annuity certain of $5,000 per year for 20 years at 4% is $67,952; at 3½%, $71,062; and 3%, $74,387. A recent actuarial study which calculates the work expectancy, taking into account probabilities of death, disabilities, and retirement, reflects figures which do not vary much from those under an annuity certain: at 4%, the present value is $66,618; at 3½%, $69,457; at 3%, $72,506.[10] If the diminution in earning capacity is considered as $4,400, then the annuity figures are 88% of these totals and range between $59,797 and $65,460. The present value[11] of the libelant's prospective loss of earnings is estimated at $62,500.

After taking into account all the foregoing and all other elements of damage, the Court awards total damages in the sum of $90,000.

█ There remains for final consideration the claim for maintenance and cure. Respondent has discharged its obligation up to the date of trial. Libelant's doctor testified that to reach the point of maximum possible cure a fusion operation is required which in large measure would eliminate future pain; that surgery, hospitalization, and post-operative treatment would extend over

10. Smith & Griffen, Work-Life Expectancy as a Measure of Damages in *Transactions in the Society of Actuaries* (Jan. 1953).

11. Gulf, C. & S. F. Ry. v. Moser, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200; Thompson v. Camp, 6 Cir., 163 F.2d 396.

approximately twelve to sixteen months. The expense of the operation was estimated by the doctor as $400 to $600. Maintenance and cure is allowed for a period of one year at the rate of $8 per day, plus the sum of $400 for the cost of the operation.

In sum, libelant is entitled to judgment upon the first claim in the amount of $90,000, and upon the claim for maintenance and cure in the amount of $3,320.

Decree to enter accordingly.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Should either party desire enumerated or additional Findings, these may be proposed upon notice to the other side.