William Clyde MASON, Plaintiff,

v.

LYNCH BROTHERS COMPANY, a corporation, Defendant.

Civ. A. No. 1636.

United States District Court
E. D. Virginia, Norfolk Division.

Jan. 12, 1955.

C. Lydon Harrell, Norfolk, Va., and John J. Robinson, New York City, for plaintiff.

John W. Oast, Jr., and David H. Batchelder, Jr., Norfolk, Va., for defendant.

HOFFMAN, District Judge.

This action is instituted by William Clyde Mason, the master of the tug Navassa, against her owner and operator, Lynch Brothers Company, a contract carrier, seeking damages for personal injuries under Section 33 of the Merchant Seamans' Act of June 5, 1920, Title 46 U.S.C.A. § 688, generally referred to as the Jones Act. In addition, plaintiff asks for maintenance and cure, as well as retroactive pay.

Plaintiff contends that on February 19, 1953, at the direction of the defendant, he served as captain of the tug and boarded same at the Colonna Shipyard at Norfolk. As per instructions the tug took in tow a certain steel barge at the Norfolk Terminal of the Gulf Oil Company. The barge was loaded with fuel oil (kerosene) and was destined for City Point, near Hopewell, Virginia. The tug and tow arrived at City Point on the morning of February 20, 1953, and plaintiff commenced pumping the barge at 9 A. M. Pumping operations continued until 3:30 or 4:00 P. M., when the accident occurred, and thereafter were completed under the direction of the First Mate, Snyder.

Plaintiff was injured when he endeavored to climb from the barge to the tug, at which time the barge was a couple of feet higher than the rail of the tug. His foot slipped, and he fell to the deck of the tug a distance of between four and five feet. There is no definite proof that any oily substance was in the immediate vicinity of the point of plaintiff's fall, but it may be fairly assumed from the evidence that the "tracking" of oil on the deck of the barge had caused the slippery substance to remain on plaintiff's shoes, thereby bringing about the fall. The injury was immediately reported to the defendant by telephone, and plaintiff was brought to Norfolk that night. He reported at the U. S. Public Health Service Hospital at Norfolk on February 21, 1953, for examina-

tion and treatment as an out-patient. Plaintiff thereafter entered the Hospital on March 16, 1953, where he remained until May 8, 1953. Not responding properly to treatment, he again entered the Hospital on July 27, 1953, at which time he underwent on operation for the repair of two tendons in his right shoulder, and subsequently left the Hospital on September 13, 1953. As of October 23, 1953, he was declared "fit for duty" in two weeks, but the evidence indicates that he returned to work on October 27, 1953.

Prior to the operation in question, plaintiff's motions of the right arm and shoulder were limited by fifty per cent. The corrective operation reduced this limitation to between ten per cent and twenty per cent. The evidence discloses that, as of the date of trial, plaintiff cannot raise his right arm higher than the level of his shoulder and this is done only with considerable effort. The motions of the arm and shoulder are otherwise limited to some extent. It is admitted that the injury is permanent and that, for all reasonable purposes, the plaintiff has now sustained a maximum recovery, bearing in mind his 55 years of age. No medical expense is herein involved.

Plaintiff was first employed by defendant in 1949 or 1950. His services were considered very satisfactory and, with the possible exception of lack of leadership, the defendant is high in its praises of plaintiff's ability. His first employment was that of Relief Captain, and he thereafter became First Mate and subsequently Captain. When hired, Clay H. Lynch, President of defendant corporation, stated that "he had been given to understand that Mason was a licensed officer". A check was made with plaintiff's former employer, F. T. Bray, to ascertain plaintiff's ability as a tug captain, but no specific inquiry was made as to whether plaintiff was a licensed officer or a certificated tankerman. The evidence reveals that plaintiff was actually employed by one Law, an officer and Norfolk Branch Manager of defendant, who states that "I believe he did tell me he had a license". This evidence is not sufficiently impressive to convince the Court that plaintiff made any false representation. Furthermore, the record of such licenses was readily available to the defendant who frankly admits that no efforts were ever made to verify the alleged statement. Defendant does not contend that plaintiff ever represented himself as a certificated tankerman.

Section 31.15–5 of the Coast Guard Regulations relating to tank vessels (November 19, 1952) provides in substance that there shall be one licensed officer or one certificated tankerman on board. That this regulation was violated by the defendant is admitted, although defendant contends that, until the trial date, it had been of the opinion that plaintiff was a "licensed officer". What then is the effect of this violation as related to the accident in question?

On board the tug Navassa, on the trip in question, in addition to plaintiff who was serving as Captain, were the following: a First Mate (Snyder), a Chief Engineer (John Brogan), an Assistant Engineer (W. J. Brogan, son of John Brogan), a Cook (name unknown), and a Deckhand (Langley). Snyder, the two Brogans, and plaintiff testified with respect to the trip and resulting accident. Neither the Cook nor the Deckhand (Langley) were produced as witnesses. All witnesses for the plaintiff, excepting Snyder, testified that there was oil on the aft end of the deck of the barge when the tug took her in tow on the afternoon of February 19, 1953. Snyder neither affirms nor denies same. Clay H. Lynch described the condition of the deck at the time he inspected the barge at noon on that day as "clean as is normal for any oil barge", at which time Lynch stated that the barge was already loaded. Plaintiff made no complaint to defendant as to the condition of the barge prior to the commencement of its voyage, nor does it appear that any complaint was made at any time prior to the accident. Similarly, all witnesses

for the plaintiff stated that, during the pumping operations at City Point, there were an abundance of oil spots near the pump and strainer located at or near the stern of the barge, and that, by reason of passing to and from shore, as well as to and from the tug, tracks of oil had been created. The evidence further indicates that it had been raining during the day.

It is interesting to note the personnel of the crew other than the plaintiff. During the time in question the employees of Curtis Bay Towing Company were on strike, and Lynch employed Snyder and the two Brogans to work on a temporary basis with the understanding that these men would return to Curtis Bay at the termination of the strike. An effort was made by defendant to attack the credibility of Snyder and the two Brogans, because John Brogan thereafter left the defendant's vessel in North Carolina when called back to work. There is no merit to this contention and the Court would be required to indulge in the greatest of suspicion to believe that these witnesses were unduly prejudiced in their testimony. As previously indicated, none of the crew were licensed officers or certificated tankermen.

According to the plaintiff, he observed the oil on the deck of the barge and ordered the deckhand to clean same. The deckhand (Langley) refused to obey, assigning as a reason that he "wasn't going to bother with it, 'cause if he got hurt, he wouldn't get anything". The disobedience of this order was never reported by plaintiff to defendant and plaintiff admits that he, in his capacity as Captain, did nothing further to see that his order was carried out. This Court does not accept as credible the refusal and assigned reasons of the deckhand. As was so aptly stated in Mormino v. Leon Hess, Inc., D.C., 119 F. Supp. 314, 318, affirmed per curiam, 2 Cir., 210 F.2d 831, such a statement "sounds too much like a sea-lawyer" and not what a deckhand would say. It is difficult for this Court to believe that a deckhand, having been instructed to perform a menial task of wiping oil from the deck, would respond with a view to a possible injury and his ability to collect damages. Plaintiff testified that there were no mops or other cleaning implements aboard, but states that the deckhand could have used rags and wiped up the oil. Clay H. Lynch stated that brooms, mops and rags were available on the Navassa. It does not appear to be necessary to determine this conflict in the evidence as admittedly some material was on board which would have substantially answered the requirements.

At the time the pump is started for unloading operations, it appears that it is necessary to prime the same through the medium of a bilge pump. Thereafter, unless the operator in charge of unloading is derelict in his duty by reason of not cutting down the valves in the several tanks at the proper time, further priming is not required. It appears that the pump was primed on several occasions after the commencement of unloading operations, and that a small quantity of fuel oil would or did escape as a result of this priming. Perhaps an experienced tankerman or more experienced man than plaintiff could have successfully unloaded the barge in question without the loss of any of its contents or the spillage on deck. Lynch, a certificated tankerman, stated that oil occasionally spilled but that he always remedied the situation. Lynch admitted that he was familiar with the Coast Guard Regulations, and that on the tug Confederate, operated by defendant, a tankerman was provided as per union contract. Defendant insists that, if a tankerman is aboard, it is the duty of the tankerman to clean the deck but, in the absence of a tankerman as in this case, it was plaintiff's duty to clean the deck, although defendant concedes that plaintiff had the right to call upon the deckhand to assist in the cleaning. Defendant states that there are six bunks on the Confederate which enables defendant to carry a tankerman. On the Navassa there are bunks for five with two additional bunks in the forecastle. In ex-

planation of this contended lack of space and being confronted with the number of crew of the Navassa on the trip in question (same being six), Lynch stated that the Navassa did not usually carry a deckhand, but on this trip one was made available.

Plaintiff contends that only once prior to the accident in question was he ever required to pump out the barge. Defendant denies the truth of this statement and relates hearsay statements (without objection) as to the extraordinary ability of plaintiff to serve in this capacity at some place in North Carolina. None of the witnesses testified that they had ever seen plaintiff perform this work prior to the date of the accident.

Plaintiff further testified that, prior to the commencement of the trip, he asked Lynch who was going to Hopewell to pump out the barge and was told that one Archie Butler would be there. Defendant denies this statement but admits that its men were in North Carolina attending to some trouble with a boat in that locality. On the morning of the accident plaintiff admittedly telephoned Lynch. The details of this conversation are in dispute. Plaintiff states that Lynch told him that he couldn't send Butler as all of his men were in North Carolina, and that plaintiff would have to pump the barge. As related by Lynch, plaintiff told him that he (plaintiff) was sick with the "flu"; that he was having "dizzy spells", and that he wanted a relief. Lynch contends that he told plaintiff to turn over the tow to Snyder, the Mate, if plaintiff thought it necessary, and that Butler's name was never mentioned. Lynch pointed out that Butler was a Vice-President of the corporation whose chief duties were maintenance and equipment, and that Butler was used only for expert mechanical services. When plaintiff reported to the Hospital the following morning, there is no indication from the record that he was suffering from a "flu" attack and, in the absence of affirmative evidence, the Court cannot assume that plaintiff sustained his fall as a result of a "dizzy spell". There is some evidence from the original record of the Hospital that plaintiff made a statement indicating he had such a spell, but this record was subsequently corrected by the Medical Officer having entered same thereon. The Medical Officer in question was not a witness before the Court and no showing has been made which would justify the Court in assuming that a "dizzy spell" occurred at the time of the accident. Plaintiff's blood pressure fails to disclose any alarming condition along this line and, while plaintiff was quoted by Snyder as indicating that he "didn't feel particularly well and wished that he didn't have to pump out the barge", this statement would only tend to indicate that plaintiff may have revealed to Lynch that he was slightly indisposed.

An ordinary seaman is qualified, according to the evidence, to sail as a mate or captain of a tug. The plaintiff held an A/B ticket which permitted him to serve as captain of the Navassa.

█ █ Plaintiff knew that a slippery deck created a dangerous condition and, of course, he had actual knowledge of the existing circumstances. He had sustained a prior accident under somewhat similar conditions. It was raining slightly at the time, thereby increasing the hazard. He states that he saw Lynch prior to sailing, but never pointed out the oily condition of the deck. He apparently did not complain to his employer when he was required to pump out a barge on a prior trip. Plaintiff is, therefore, guilty of contributory negligence. What, then, is the nature of such contributory negligence? Does it serve to reduce the amount of the employee's recovery, or does it operate as a bar? In this connection the Court is persuaded by the reasoning of Circuit Judge Learned Hand in Walker v. Lykes Bros. S. S. Co., 2 Cir., 193 F.2d 772, 773. While it is true that the factual situations are different, the fundamental principles are strikingly similar. In the Walker case, Judge Hand said:

"The important thing in situations like that at bar is to distinguish between such a duty, which the law imposes upon the injured person, regardless of any conscious assumption of a duty towards the wrongdoer, and a duty which the injured person has consciously assumed as a term of his employment. By 'contributory negligence' which results in no more than reducing the amount of an employee's recovery, the Act means the first; the second is a bar to any recovery."

The Walker case deals essentially with an improper charge to the jury but, in the case at bar, no jury was demanded. The Second Circuit held that the District Judge should have submitted to the jury by an appropriate charge the fact that Walker, as master of the vessel, was required to take proper and reasonable steps to remedy the existing defective condition, and was further required to see that his orders, if given, were carried out. While holding that the burden was on the defendant to prove not only that plaintiff was at fault, but that his fault had been a cause of his injury concurrent with the faults of other employees, this is an issue of fact which this Court may properly decide in this case.

■ If this controversy involved a seaman not serving as master of the vessel at the time, this Court would permit a recovery. The issue is admittedly narrow and the sole question ⅋ the applicability of the doctrine in Walker v. Lykes Bros. S. S. Co., supra. Plaintiff had actual notice of oil on the deck of the barge at all times; he had been involved in a prior accident under similar circumstances and knew of the attendant dangers; he knew that it had been raining, thereby increasing the hazard; when he telephoned his employer (defendant) prior to unloading the barge, he made no complaint about the oil on deck; he admittedly did nothing to remedy the situation and, even though this Court should believe that plaintiff had issued orders to the deckhand only to

be met with a refusal to obey, plaintiff took no further steps to see that his orders were carried out, nor did he subsequently report such disobedience to his employer; in addition, there is no apparent reason why the oily condition of the barge deck could not have been cleaned by the plaintiff and other members of the crew. As was said in the Walker case:

"Thus, if the plaintiff failed to repair the catches, although he was able to do so, his failure was not only 'contributory negligence' in the first sense, but also a breach of his duty to the defendant which barred his recovery absolutely."

Not having taken any precautions to prevent the occurrence of the accident, it follows that plaintiff is barred from any recovery except for maintenance, cure and retroactive pay.

The case of Walker v. Lykes Bros. S. S. Co., supra, while frequently cited, has not been distinguished or criticized in any subsequent case except in Mormino v. Leon Hess, Inc., supra. In the Mormino case, the negligence of another party intervened between Mormino's neglect and his injury. Furthermore, the union contract imposed no duty upon Mormino to clean oil from the deck and the Court so held. In the present case, the union contract was silent as to any duties of employees affected thereby. The Mormino case, in effect, gives indirect approval to Judge Hand's ruling as set forth in the Walker case. See also the distinguishing features in Dixon v. United States, D.C., 120 F.Supp. 747, 751, involving an injury to a chief mate occurring while in the process of carrying out a duty owed to his employer.

■ Plaintiff urges that defendant's violation of § 31.15–5 of the Coast Guard Regulations carries with it a presumption of negligence to be considered by the Court. While no certificated tankerman or licensed officer was on either the tug or barge, is the defendant violator to be penalized with the *burden of showing that the violation not only probably did*

*not cause the accident, but that it could not have done so?* This is the accepted rule arising from collision cases. The Pennsylvania, 19 Wall. 125, 135, 22 L.Ed. 148; The Eagle Wing, D.C., 135 F. 826; Standard Transp. Co. v. Wood Towing Corp., 4 Cir., 64 F.2d 282. While there may be no basic reasoning why this rule should not be extended to non-collision personal injury cases, there is reputable authority to the effect that the rule is limited to collision cases. Griffin On Collision, (1949 Ed.), § 254. In The Amagansett, 2 Cir., 220 F. 827, 830, the Court pointed out that a "license does not always make a good pilot, nor the lack of it a poor one". Under the evidence submitted in this case the Court is not of the opinion that the violation of the statutory requirement was a proximate cause of the accident and, even if the Court has misconstrued the law on this point, it is still rather difficult to conceive that plaintiff can avoid the doctrine in Walker v. Lykes Bros. S. S. Co., supra.

■■ As to maintenance, the obligation of the employer arises out of contract. Maintenance while being cured takes the place of the seaman's sustenance on the ship. Essentially it covers food and lodging. While plaintiff was an in-patient at the Hospital he is, of course, entitled to no maintenance. In order to recover for maintenance, he must offer proof of expenditures made or liability incurred. In this case plaintiff estimates same at $6 per day. He was an in-patient for 99 days. He is, therefore entitled to maintenance for 145 days, as he was disabled for 244 days (after deducting 4 days during which he worked and was paid). No specific proof of specific items has been produced. The Court must, however, take some cognizance of existing conditions in this locality and, in addition, defendant's Ex. No. 3 refers to $2.25 per day for food. The Court will, therefore, allow $5 per day for 145 days. During the time plaintiff was an out-patient he lived in his home with his family. Under such circumstances it is almost impossible to itemize expenditures as such.

Referring to the claim for retroactive pay, it is necessary to examine plaintiff's Ex. No. 3 and defendant's Ex. A (attached to answer). Defendant contends that an agreement with the union made it unnecessary to pay in accordance with the Wage Stabilization Committee's recommendation dated January 14, 1953, retroactive to February 1, 1952, until subsequent to the pay period ending June 30, 1952. The union representative admits to a verbal understanding of this nature, but states that this understanding was not to be construed as depriving any member of his rights to insist upon retroactive pay to February 1, 1952. The column on the extreme right of defendant's Ex. A (attached to answer) is accepted as correct for the pay period beginning July 1, 1952, but is referred back to counsel for computation covering the pay period of February 15, 1952, to June 30, 1952, both inclusive, in accordance with plaintiff's Ex. No. 3. The total amount payable to plaintiff by reason of the retroactive provisions shall be subject to a credit of $450 heretofore paid. The Court does not regard defendant's Ex. No. 2 as binding upon plaintiff with relation to retroactive pay features.

At the conclusion of the evidence defendant requested additional time to present evidence, if available, as to the condition of the valve on the barge. Defendant's counsel has now advised the Court that no further evidence will be presented. In view of this opinion, such evidence would not be essential in any event.

Counsel for defendant will prepare an order in accordance with this opinion.