Andrew H. BURGESS, to his own use and to the use of Liberty Mutual Insurance Company, Libelant,

v.

FARRELL LINES, INC., Respondent.

Admiralty No. 4294.

United States District Court
D. Maryland.

March 28, 1963.

Fred Ginsberg and Eugene V. Chircus, Baltimore, Md., for libelant.

David R. Owen, Baltimore, Md., for respondent.

NORTHROP, District Judge.

This is an action by a stevedore Burgess, libelant, against the steamship company, Farrell Lines, Inc. While unloading the S.S. African Dawn in Baltimore on September 12, 1959, Burgess sustained a serious injury to his right foot, ultimately causing amputation after several extended hospitalizations.

The incident occurred while Burgess, a bulldozer operator employed by The Chesapeake Operating Company, was guiding or pushing a grab bucket, along with other employees of that stevedoring firm, in the after port deep tank of the African Dawn. The stevedores were discharging manganese ore and the dis-

charging procedure had been in progress since 8:00 a. m. of that day. The injuries to Burgess occurred around 10:15 p. m.

Libelant has four principal contentions.

### I

Libelant contends that the crew of the vessel S.S. African Dawn had actual or constructive knowledge that the bulldozer was defective.

Burgess was the bulldozer operator of the stevedoring company employed to discharge the ore. During the day, two bulldozers belonging to that company had become inoperative and been removed from the vessel. The third was not being driven by Burgess at the time of the accident; it is admitted by the foreman, James Cecil Lambert, that the clutch was slipping and he did not call for a mechanic to repair it because the discharge procedure had gotten to the point where only trimmers shoveling ore from the pocket to the square of the hatch were effective to complete the operation. Burgess was ordered to place that bulldozer in the wing. This was about an hour before his injury.

The bulldozers used, of necessity, were of a light weight. Because of the heavy ore, frequent minor breakdowns occurred which customarily were repaired on the spot by the two full-time mechanics employed by the stevedoring company and on call for that purpose. Also, the bulldozers were moved from tank to tank by the stevedores on occasion.

Lambert had been supervising discharging in the deep port tank for some time before Burgess reported the slipping clutch to him, and he ordered him to drive the bulldozer into the wing of the tank and step down. Burgess claims that there was a complete breakdown necessitating pushing the bulldozer into the wing.

It is a fact that no member of the S.S. African Dawn's crew was in the tank at that time. There is evidence that the mate in charge of the vessel on occasion observed the discharging from the deck. There is some evidence, also, that another mate, or at least a crew member, was standing by on the deck at the No. 4 hatch from which the ore was being discharged.

Foreman Lambert testified that when the condition of the bulldozer was reported to him, the unloading had progressed to the point where it was impractical to use it further. Trimmers were even then shoveling ore from the pockets to the square of the hatch. Indeed, he testified that fifteen or twenty minutes after Burgess had, on Lambert's orders, moved the bulldozer to the wing, Lambert tried to test the clutch and the ore was so close to the skin of the tank he could not even give it a proper test.

It is strenuously argued that under these circumstances the ship had notice, actual or constructive, of the defective bulldozers, and the failure of the ship to provide a properly working bulldozer made this vessel unseaworthy. Libelant desires this Court to stretch the doctrine of Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) to cover this case. These bulldozers were owned by the stevedoring company and maintained and operated by a skilled crew of stevedores. The machines are specialized longshore equipment requiring skilled operators. The bulldozer, with its eccentricities, is not a mutually used piece of gear such as a block or winch. Furthermore, the preponderance of evidence indicates that the discharging had reached the point where its use was no longer feasible. Be that as it may, it is not necessary to make a finding on these points, as impelling as they are to find for the ship. The Court finds that whatever the defect of the bulldozer might have been, its inoperative condition or alleged unseaworthiness did not have a causal relation to libelant's injury. Fox v. The S.S. Moremacwind, 285 F.2d 222 (4th Cir. 1960).

### II

Libelant secondly contends that the shipowner warrants the seaworthiness of the

cargo and the equipment and appurtenances necessary to discharge it.

There can be no quarrel with libelant's point here as a principle. To the cases such as Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) and Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) might be added Moore-McCormack Lines, Inc. v. Maryland Ship Ceiling Company, 311 F.2d 663 (4th Cir., 1962).

How the application of the principle of "transitory unseaworthiness" as it has come to be known can be employed here is difficult to discern. Libelant's contention is that the grab bucket of about one-and-a-half tons (the lightest used in ore unloading), which he admits is seaworthy in every respect, becomes unseaworthy when pushed or used outside of the square of the hatch. This appears to the Court as an attempt to get around the doctrine of Blankenship v. Ellerman's Wilson Line New York, Inc., 265 F.2d 455 (4th Cir., 1959) which prevents recovery by an independent contractor or stevedore where there was negligent use by his fellow employees of seaworthy equipment, causing his injury.

After the Mitchell case, supra, the Supreme Court decided Morales v. City of Galveston, Texas, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962). See Unseaworthiness, 76 Harvard Law Review, 819 (February 1963). This case was first remanded by the Supreme Court for reconsideration in the light of Mitchell. The court ultimately held in effect that unseaworthiness liability depends upon the shipowner's active or constructive knowledge. Morales might be said to suggest that " 'divorcement' of negligence and unseaworthiness is not so 'complete' " as Mitchell would like one to believe.

It would appear that the judge must look to see whether or not the defendant's action was consistent with reasonable prudence. Thus, the duration of a condition becomes relevant and there must be a foreseeability. So, in this case, the use of the bucket in an allegedly negligent manner and the length of time this procedure continued are factors determinative of finding a condition of unseaworthiness. In essence, this particular contention by the libelant phases into his third complaint treated herein as well as his fourth contention concerning the lack of illumination in the area of operation, creating unseaworthiness.

### III

Libelant further contends that the failure of the ship's crew to take effective measures to prevent an unsafe method of unloading cargo constituted negligence.

When Burgess was injured, he and two other stevedores were assisting Lambert in pushing the grab, or clam, bucket into a position over the ore. It would then, on signal, be dropped to pick up ore, which was hoisted through the hatch. There is no dispute that the type of bucket used was light, weighing about one-and-a-half tons; that it was in good working order and seaworthy; and that it was rigged at the after end of the square of the hatch in order to grab ore from the after part of the tank. There had been from seven to thirty hoists before the accident occurred; testimony varied that much. It was agreed by everyone save Burgess that Lambert signaled Downing on deck, who passed the word to the winchmen. Arthur L. Downing was acting as deckman at the time and was gang carrier for a group of stevedores working the ship.

Burgess and Lambert were on the forward end of the bucket, while two other stevedores were on the port side. Downing heard oral signals or saw hand signals and reacted immediately. When Lambert hollered "back on it" all hands got out of the way and the bucket was dropped. One stevedore on the port side stated that the word or hand signal meant to him "get out of the way." Burgess stated he did not hear the signal when the bucket dropped on his foot, although Lambert testified he warned all hands, including Burgess, to be careful.

Stevedoring in all respects is a hazardous calling. The discharging and loading of ore is considered particularly so. The question raised is, was this procedure of handling the bucket customary and proper, or was it such an unusual and dangerous method as to constitute negligence on the part of the ship, having actual or constructive notice, in not stopping the stevedores. Burgess' fellow stevedores testified that they had seen buckets guided but not "swung." Their foreman Lambert testified that guiding or pushing the bucket to get a larger bite at this point in the unloading was the ordinary and proper way of discharging ore in trimming out a tank. An expert ship's surveyor, Ford Nicholas Mercer, whose duty it was to attend the discharge of ore-carrying vessels and who stated that he watched such operations on an average of 250 a year, testified that it was regular, proper and customary.

■ The stevedore who testified that he knew that the words "back on it" meant "get out of the way" corroborates respondent's position that the procedure was the normal one used in trimming out a tank. The Court finds that handling the bucket in the manner indicated was customary and proper under the circumstances.

■ Nor would this ship in this case be liable on any theory of unseaworthiness based on a condition negligently created, even if normal operative procedure for unloading had not been employed. We must hold as in Billeci v. United States, 298 F.2d 703, 705–706 (9th Cir. 1962):

"[T]he shipowner's warranty of seaworthiness does not extend to a negligent use by longshoremen of seaworthy appliances."

The Court finds that even if there had been negligence in the present case, it would have been that of the stevedore and that it would have been operational negligence as distinguished from a condition negligently created. While the distinction is proving difficult in application, this case is probably easier to categorize than most for here there was a continuous operation, ordered and controlled and progressing by the stevedores at the time of the event. See Puddu v. Royal Netherlands Steamship Company, 303 F.2d 752 (2nd Cir., 1962). A condition negligently created is active negligence on the ship's part which has come to rest. See Unseaworthiness, 76 Harvard Law Review 819, 824 (February 1963). On this basis, Mitchell v. Trawler Racer, supra, may be distinguished, since in that case the hazardous condition was one which lingered, due to the ship's oversight, after the unloading had been accomplished. Cf. also Billeci v. United States, supra, 298 F.2d at 706, and cases cited thereat.

■ Nor, traditionally, is a recovery for unseaworthiness warranted for operational negligence even of a master or crewman, provided he is competent. Gilmore & Black, The Law of Admiralty, 320 (1957):

"The only case which is today clearly outside the scope of the unseaworthiness doctrine is * * * an injury whose only cause is an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy."

See also Pinto v. States Marine Corporation of Delaware, 296 F.2d 1 (2nd Cir., 1961).

Thus, if the African Dawn was otherwise seaworthy, the question of the propriety of a procedure being followed would raise only the question of the competence of the longshoremen's supervisors.

In Berti v. Compagnie De Navigation Cyprien Fabre, 213 F.2d 397 (2nd Cir., 1954), the following pertinent statement appears at page 400:

"If plaintiff's injuries resulted solely from the manner in which the work was done under [the stevedore's] supervision, he has no recourse against [the owner]."

This statement was quoted approvingly by Judge Hoffman in Holley v. The Manfred Stansfield, 165 F.Supp. 660, 663 (E.D.Va.1958), rev'd on other grounds,

269 F.2d 317 (4th Cir. 1959), cert. denied, Reederei Blumenfeld G. M. B. H. v. Holley, 361 U.S. 883, 80 S.Ct. 154, 4 L.Ed. 2d 119 (1959).

In Signore v. The Ferngulf, 103 F. Supp. 677 (S.D.N.Y.1952), the court's finding was that the longshoreman was injured because of the manner in which the stevedores with whom he was working had carried out their work. In directing judgment for the ship, the court quoted from Riley v. Agwilines, Inc., 296 N.Y. 402, 407, 73 N.E.2d 718, 720 (1947) as follows:

"The maritime law imposes no liability upon a vessel or its owner when a longshoreman employed by a stevedoring corporation engaged in loading or discharging the vessel is injured because of the manner in which the longshoremen carry on the work or because of their failure to use appliances furnished for their use * * *."

Therefore, even if the longshoremen's method of operation aboard the S.S. African Dawn were deemed to be unsafe, the ship cannot be held unseaworthy on that account.

## IV

Libelant contends finally that the failure of the ship's crew to provide a proper amount of illumination in the place where the longshoremen were doing their work made the ship unsafe.

Burgess' only contention in reference to the gear and equipment of the ship is that there was defective lighting in the tank in which he and the other stevedores were working, thus making the ship unseaworthy. The light was described as dim by various witnesses.

One of the principal witnesses who testified to this was Downing, who testified that he had sent one of his gang and a ship's mate for additional light. However, among the statements made shortly after the accident is his statement that the lighting was good.

Burgess himself testified that the lighting was adequate for his purpose of bulldozing the ore, as well as guiding the bucket. Both the gang foreman Lambert, who was in the tank at the time, and the ship's mate testified that the lighting was adequate. There was further testimony that if any additional lighting had been needed, this could have been obtained from the adjacent starboard deep tank.

Downing testified further that he could see and recognize the four men around the bucket at the time of the accident, but could not, of course, see their hands and feet because of the contour of the bucket which interfered with his vision. But he heard and saw clearly all signals given by the foreman Lambert, passing them at once to his winchmen.

█ Counsel for libelant admitted this particular charge of unseaworthiness with respect to the ship had been controverted by the ship, but asked that the Court take judicial notice of the fact that the bucket would cast shadows. The preponderance of evidence is against Burgess, and the Court must find that the lighting was adequate. In this respect, the vessel was seaworthy, as it was in all others.

Since the Court is compelled, by the facts as it finds them, to hold that the respondent was not negligent and its ship not unseaworthy, it is not required to decide whether the libelant was himself negligent.

For the foregoing reasons, it is found that the respondent has not breached any legal duty which would impose liability upon such respondent, and that libelant is not entitled to recover.

Counsel for respondent will prepare and present an appropriate decree within ten days.