Andrew H. BURGESS, to his own use and to the use of Liberty Mutual Insurance Company, Appellant,

v.

FARRELL LINES, INC., Appellee.

No. 9129.

United States Court of Appeals Fourth Circuit.

Argued Nov. 18, 1963.

Decided July 27, 1964.

Eugene V. Chircus and Fred Ginsberg, Baltimore, Md., for appellant.

William R. Dorsey, III, and David R. Owen, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.

BOREMAN, Circuit Judge:

Plaintiff, Burgess, seeks damages for injuries sustained while engaged as a longshoreman in unloading a cargo of ore from defendant's vessel, the AFRICAN DAWN, charging unseaworthiness of the vessel and negligence of the defendant. The defendant denied liability and, in turn, filed a Third-Party Complaint against Chesapeake Operating Company, the stevedore employer of the plaintiff, which complaint was dismissed prior to the trial had before the court without a jury. The court found neither unseaworthiness nor negligence [1] and entered judgment for defendant. We affirm.

Plaintiff was regularly a bulldozer operator and was so engaged until shortly before the accident. He went to work with fellow longshoremen at eight o'clock in the morning and started to unload ore from the "after deep tanks" of the vessel's No. 4 hatch. Discharge of the cargo was accomplished by use of a "grab bucket" owned and furnished by the stevedore which was attached to the ship's gear. Its movements controlled by the ship's winches, the bucket grabbed the ore and lifted it through the hatch, depositing it in railroad cars on the pier. During the early stages of the work the bucket was allowed to fall free into the hold. However, as unloading progressed it was necessary to position the bucket at various points around the square of the hatch and, in this operation, hooks or blocks were placed at the forward and after ends of the hatch coaming. The bucket was lowered to a position in the center of the hatch just above or on the shaft alley by means of the "up and down fall" which was controlled by a winch on deck. Another fall, called the "burden fall," which was slack, was placed in the hook and was controlled by a second winch operated by longshoreman Clarence Dates. A strain was then taken on the burden fall while the up and down fall was slacked off. By this means the bucket was pulled to a position directly beneath the hook through which ran the burden fall and over piles of ore.

Plaintiff's usual job was to operate a small bulldozer to push the ore from the wings and far sections of the hold into piles within reach of the grab bucket when falling free or when pulled forward or aft in the maneuver described. It is apparently undisputed that at least two of the stevedore's bulldozers had broken down during operations on that particular day and had to be removed. A third was brought into the hold and there was testimony to the effect that about one hour before the accident its use was discontinued because the clutch was slipping and plaintiff was instructed by his foreman to move the bulldozer to the wings and out of the way. The stevedores then used shovels to get the ore which was close to the "skin" of the tank, between the ribs, in the bilge pockets and close areas in position to be grabbed by the bucket. However, other testimony showed that, at the time the use of the last bulldozer was discontinued, it was not inoperable but the quantity of ore in the hold was so low and so positioned that the use of the bulldozer was impracticable. After the shoveling was begun the longshoremen, including plaintiff, pushed or guided the grab bucket with their hands to spot it over various piles of ore.

Immediately prior to the accident they were using the hook on the aft side of the hatch coaming to spot the bucket and four men in the hold were pushing or guiding. Lambert, the stevedore foreman, was at the forward end of the bucket. Next to him, on the same side and only about a foot away, was Burgess. Two other men were on the port side of the bucket. The four would push or guide the bucket over a pile of ore at which time Lambert would yell "back on it" to Downing, the stevedore "gang carrier," who was on deck. This was the signal for the bucket to be lowered into the ore and for the men around the bucket to get out of the way. Downing would immediately relay this signal to winch--

1. Burgess v. Farrell Lines, Inc., 215 F.Supp. 319 (D.C.D.Maryland 1963).

man Dates who would then ease off on the winch controlling the burden fall, thereby lowering the bucket. The position of Dates' winch prevented him from seeing or hearing Lambert. The accident occurred when the bucket dropped and landed on Burgess' foot, causing serious injury. Plaintiff testified that he did not hear Lambert's signal to drop the bucket although it was heard by the other men guiding the bucket and by Downing who was on deck. Lambert testified that he warned all hands, including Burgess, to be careful. The District Court observed that, after the pushing or guiding operation was begun, there had been "from seven to thirty hoists before the accident occurred; testimony varied that much." It seems clear, however, that the accident happened within forty-five minutes to an hour after the use of the bulldozer was discontinued. There was no difference between the operation in the course of which Burgess was injured and the previous manual bucket-guiding operations; when the bucket was properly spotted, Lambert signaled to Downing who passed the signal to Dates who, in turn, promptly lowered the bucket. Unfortunately, however, the bucket landed on Burgess' foot on this particular occasion. Following the accident the longshoremen continued to follow the same procedure until the discharge of the ore was completed.

█ Plaintiff contended at trial that the failure of the ship's crew to provide a proper amount of illumination in the hold rendered the ship unsafe and unseaworthy. But the District Court found as a fact, from a preponderance of the evidence, that the lighting was adequate and noted that "Burgess himself testified that the lighting was adequate for his purpose of bulldozing the ore, as well as guiding the bucket." (215 F.Supp. 319, 323). This finding is amply supported by the evidence. Except as to alleged inadequate lighting, it is uncontroverted that all of the gear and equipment furnished by the ship was in perfect working condition.

The "top man" aboard for plaintiff's employer was supervisor Henry Thompson. The stevedores had complete control of the discharging operation and they selected the method used. Both Chief Mate Daly and Frank DiVenti, the latter being the only mate on watch at the time of the accident, had occasionally observed the discharging operations but neither of them saw or knew that the stevedores were pushing or guiding the bucket.

██ It must be borne in mind that this was a trial before the court sitting as the trier of fact without a jury. It is well established that a Court of Appeals may not set aside findings of fact made by the District Court in Admiralty unless they are "clearly erroneous," for no greater scope of review is exercised by appellate tribunals in admiralty cases than exercised by them under Rule 52(a) of the Federal Rules of Civil Procedure.[2] A finding of fact is clearly erroneous only when "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." [3]

Plaintiff challenges as clearly erroneous the finding below that "handling the bucket in the manner indicated was customary and proper under the circumstances" because the evidence, upon which the court based its findings as stated in its opinion, is inconsistent with the evidence in the case, and also "because the court based its finding upon improper interpretation of evidence."

In his brief plaintiff contends "that the court erred in not making a finding of fact on the point of whether the bucket was guided or shoved at the time of the happening of the accident and should have found that the bucket was being shoved at the time of the happening of the accident and that the shoving of the bucket was an unsafe procedure." In view of the findings of fact, which are

2. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed.2d (1954).

3. Id., 348 U.S. 19, 20, 75 S.Ct. 6, 8.

overwhelmingly supported by the evidence, we are at a loss to understand this contention. In the second paragraph of the District Court's reported opinion (215 F.Supp. 319, 320), it is unequivocally stated that the incident occurred while Burgess was *guiding* or *pushing* a grab bucket along with other employees of the stevedoring firm. Again, at page 321, the court stated as a fact that, when Burgess was injured, he and two other stevedores were assisting Lambert in *pushing* the bucket into position over the ore. The plaintiff's statement is all the more unintelligible since there appears to be no conflict whatsoever in the evidence as to the manner in which the bucket was being handled. Burgess did deny knowledge of the giving of a signal to lower or drop the bucket, but on that point the court found that it was agreed by everyone save Burgess that Lambert signaled Downing on deck, who passed the word to the winchman.

█ Thus, our first problem is to interpret this assertion of error. We think the thrust of plaintiff's argument is that the shoving of the bucket was *an unsafe procedure* and the trial court should have so held in those words rather than finding that pushing or shoving the bucket in position to pick up the ore was "customary and proper under the circumstances." However, from the court's reported opinion, considered as a whole, it is apparent the actual finding was intended as the equivalent of a finding that the procedure followed was reasonably safe and not unusually or unreasonably dangerous in ore discharging operations. Such finding was amply supported even though there are conflicts in the evidence on which it was based.

Downing, the gang carrier and plaintiff's lead witness, attempted to create the inference that the procedure used was unsafe but it was clearly demonstrated that his opinion derived entirely from the fact that the plaintiff was injured.[4] He said he had seen that same method used before and the men continued to use it after the accident. Although he was the gang carrier and responsible for the safety of his men, he did nothing to prevent them from using this procedure which fact strongly tends to support an inference that he considered the method of discharging reasonably safe and proper. Three other longshoremen testified that they did not consider it to be a safe operation to unload ore by pushing or shoving a bucket as was done in this case. Plaintiff contends that Daly, the Chief Mate, testified that the procedure was unsafe but his statements, called to our attention and selected out of context by plaintiff, were qualified in his further testimony when he stated that he didn't see the men pushing the bucket, he didn't know "what they were doing in pushing it" and "I don't know whether I would consider it safe or not."

Ford Mercer, an expert ship's surveyor and marine consultant of at least twelve years' experience who was called by the defendant, explained that the bucket must be guided at times in order to spot it over the largest piles of ore so that a "full grab" can be assured as often as possible. He had observed as many as two hundred ore-discharging operations in a single year. He testified that it was a routine operation to push or guide the bucket in the manner adopted by the stevedores; that he had seen it done "frequently" and "hundreds of times"; and that the pushing method was not restricted to ore

---

4. Testimony of Downing
  "Q. Did you tell the foreman you thought it was an unsafe procedure? A. No.
  "Q. Did you think it was at the time? A. Well, things were going good, so long as nobody got hurt, but we all see it's unsafe after the man got hurt.
  "Q. In other words, if the man had not got hurt you would not consider it

unsafe? A. The job would have been did, it would have been a good job if no one got hurt.
      *      *      *      *      *
  "Q. Did you tell Mr. Lambert, the foreman, you thought it was unsafe? A. No, I didn't.
  "Q. Did you think of it at the time? A. No, I didn't, all things were going smooth, we let it go as it was."

operations but was used also in connection with general cargo. He did not regard the method of discharge here used as unreasonable.[5]

Thompson, the supervisor for plaintiff's employer, with about eight years' experience in that job, personally observed the men pushing the bucket. He testified that there was nothing at all unusual about pushing or guiding the bucket by hand and that he had seen buckets pushed in a similar manner "ever since I have been with the company in the business * * *."

Lambert, a foreman for plaintiff's employer, with about twenty years' experience on the waterfront, was actually pushing the bucket along with plaintiff and two others. He also testified that the usual method of discharge was being used and that it was a customary procedure to push or guide the bucket as was done here. As appears from the record, plaintiff's own counsel, in addressing the court, said: "The testimony of the foreman for the company was that he considered it safe procedure at this time, your Honor, that he had seen it done since then * * *."

It is true that witness Mercer testified that it would have been safer for the longshoremen to have pushed the bucket into position with the bulldozer than to push it by hand. This was in response to a purely abstract and hypothetical question posed on cross-examination but there was no evidence in the case that the longshoremen ever actually pushed this bucket by using the bulldozer or even contemplated such a procedure. Furthermore, there is no evidence that such a method of operation is ever used with this type of bucket which was described as the lightest type used in discharging ore. Responding to questioning, Mercer explained that the operator was positioned back of a wide steel blade on the bulldozer which would contact the bucket in a pushing operation and that if he, Mercer, were doing this type work he would rather see a bucket pushed by a bulldozer than to push it himself. He further commented on the type of the vessel, the deep tanks of the cargo hold, the small compartments "where they don't have a large working area." The following questions and answers appear in the transcript of his testimony on cross-examination:

"Q. Mr. Mercer, it would have been a lot safer if it was necessary to push the bucket to push it with the bulldozer in this case also, wouldn't it?

"A. I imagine it would, yes, sir, but a bulldozer has a wide steel blade and the operator sits pretty far back.

"Q. And then there would not have been any men exposed to danger around the bucket?

"A. That's correct, if there was enough room where the bulldozer had room to maneuver the bucket where they wanted."

Roberts, a witness for the plaintiff, testified that he was one of the men engaged in pushing the bucket and that this was an unsafe procedure, but grave doubt was cast upon the reliability of his testimony since the stevedore's records showed that he did not work on the AFRICAN DAWN on the date of the accident and had not been paid for such work.

It was the function of the trial court to weigh and appraise all of the conflicting testimony. This the court did, and it is apparent that the testimony of the defendant's witnesses was accepted and believed, while the testimony of plaintiff's witnesses was rejected. The court had the opportunity to observe the demeanor and attitude of the witnesses who testified in open court and, having the flavor of the trial, was in the best position to determine their credibility.

5.    Testimony of Mercer
"Q. Under the circumstances that stevedores have to work in discharging ore do you consider the method of pushing the bucket to be an unreasonable one?

"A. I would not say unreasonable because it is done every day whenever they are discharging this type vessel in this type compartment, it is practically a routine matter, I have seen it done hundreds of times."

Rule 52(a), Fed.R.Civ.P. requires that due regard "be given to the opportunity of the trial court to judge of the credibility of the witnesses."[6] Illustrative of the reason for the court's rejection of Downing's testimony, defendant points to the fact that Downing testified at trial that he thought the lights in the hold were bad but, in a prior signed statement given to an investigator, he had stated that the lights were good. The court found as a fact that the lights were adequate, commenting specifically on the inconsistency of Downing's position. Downing further testified that the bulldozer had broken down. However, in a recorded interview prior to trial, Downing had stated that the bulldozer had not broken down but had been put to one side because the unloading had proceeded to a point where its use was no longer practicable. The court stated in its opinion that the "preponderance of evidence" showed that the discharging had reached a point where use of the bulldozer was not feasible.[7] The court further stated that it was "impelling" to find that the bulldozer was not defective although a determination of the point was not necessary.[8]

Obviously, the court did not credit the testimony of the plaintiff's witnesses on the question of the safety of the discharge procedure any more than it believed their testimony as to inadequate lighting in the hold and the alleged breakdown of the bulldozer. A factor to be considered is that the witnesses who testified that the method of discharge was routine, customary, proper and safe were persons in supervisory capacities or with responsible positions and, thus, best equipped to pass upon the propriety and safety of the method of work pursued. The vacillation and questionable credibility of plaintiff's witnesses, coupled with strong, affirmative testimony by experienced men in responsible and supervisory positions, indicates more than that the court's finding was not clearly erroneous. We are persuaded that the finding of the court was clearly correct. While, standing alone, the fact that the method of pushing or guiding the bucket is a routine and customary practice will not be accepted as conclusive evidence of due and reasonable care, yet it is strong evidence thereof.[9]

All of the gear furnished by the ship and by the stevedore was in proper working condition. Burgess contends, however, that the manner of using the gear was unsafe which not only rendered the ship unseaworthy but constituted negligence on the part of the ship's officers and agents as a breach of their duty and obligation to supervise unloading operations. In the face of an adverse finding that the use of the gear and equipment was safe, reasonable and proper under the circumstances, which finding is supported by competent evidence, plaintiff's contentions as to unseaworthiness and negligence are without foundation and must fail.

For the reasons stated herein, the judgment below is

Affirmed.

6. See Prendis v. Central Gulf Steamship Company, 330 F.2d 893, 895 (4 Cir. 1963).

7. 215 F.Supp. at page 320.

8. Ibid., "be that as it may, it is not necessary to make a finding on these points, as impelling as they are to find for the ship."

9. See Cia Maritina Del Nervion v. James J. Flanagan Shipping Corp., 308 F.2d 120 (5 Cir. 1962), where the court said at page 123:

"It is true, of course, that 'compliance with the customs and practices of an industry is not in itself due care,' * * * but it is evidence of due care. When the fact finder has relied on such evidence, his findings will not lightly be disregarded unless there is a particularly strong showing of the unreasonableness of the customary practice."

Cf. Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185 (4 Cir. April 1, 1964).

J. SPENCER BELL, Circuit Judge (dissenting):

When the quantity of ore remaining in the vessel's after deep tanks had been reduced to such an extent that it was no longer efficient to use the bulldozer, those in charge were left with the choice of either shoveling the coal into the center of the hatch where it could be reached by the grab bucket or devising some expedient by which the grab bucket could be moved closer to the margins of the tank. Rather than use the slower and more expensive method of shoveling the coal into position under the hatch, the men were permitted manually to push or guide the grab bucket with their hands to spot it over piles of ore positioned away from the center of the hatch. At a given signal the winchman dropped the bucket onto the ore. While playing "drop the handkerchief" in this manner with a two ton grab bucket, the predictable happened to the libellant's foot as he was pushing or guiding the bucket. To make the game even closer to Russian Roulette, the winchman could neither see nor hear the men in the hold. Commands were relayed to him from the deck.

The trial court credited the testimony of the ship's officers, the expert, the foreman, etc., none of whom customarily put their feet under the handkerchief. These gentlemen all testified it was a customary and reasonably safe way to unload a ship. We agree—that is, it was safe for the experts, officers and foremen, and also for the ship. I have no doubt that it was cheaper and more expeditious to push the bucket to the ore than the ore to the bucket. But no expert will make me believe that the practice here indulged was "reasonably safe." There was no real dispute about the method of operation. I think the court was clearly in error in holding that it was not negligent. If the practice was pursued long enough to be actually or constructively brought to the attention of the ship's officers, their failure to stop it was negligence for which they should be held liable.

It is probably true that this method often has been and is used, and often will be, so long as the courts tolerate it and the industry is indifferent to its appalling safety record.[1] The philosophy of the industry seems to be—if the men are willing to risk their lives and limbs—why should you care? The answer is that it is not the industry, and in this day of organized relief not the individual, who pays the price of such stupidity—it is society, and society cannot afford it. Other industries have stopped it, and the shipping industry will—— if the courts withdraw the monetary incentive to such substandard practices involving needless hazards to their workmen.

I would reverse.

1. The House Report accompanying the 1958 Amendment to the Longshoremen's and Harbor Workers' Compensation Act points out that stevedoring is the most hazardous of all industries which report their experience to the Bureau of Labor Statistics, having an injury frequency rate of seven times that of manufacturing. (1958 U.S.Code and Cong.News, p. 3843).