330 F.2d 185
 Thomas B. BRYANT, to his own use and to the use of Liberty Mutual Insurance Company, Appellant,
v.
PARTENREEDEREI-ERNEST RUSS, Appellee.
PARTENREEDEREI-ERNEST RUSS, Appellant,
v.
ORIOLE SHIP CEILING CO., Inc., Appellee.
 No. 9168.
 United States Court of Appeals Fourth Circuit.
 Argued January 9, 1964.
 Decided April 1, 1964.
 
 Maurice J. Pressman, Baltimore, Md., for appellant Thomas B. Bryant, and another.
 Southgate L. Morison, Baltimore, Md., (Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for appellee and appellant Partenreederei-Ernest Russ.
 Peter Parker, Baltimore, Md., (David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee Oriole Ship Ceiling Co., Inc.
 Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.
 J. SPENCER BELL, Circuit Judge:
 
 
 1
 Appellant, Thomas B. Bryant, a ship ceiler, appeals from a district court judgment exonerating appellee, Partenreederei-Ernest Russ [hereinafter Partenreederei] of liability for injuries sustained by Bryant while engaged in constructing a grain feeder box aboard Partenreederei's vessel, the S. S. Christian Russ. The district court, sitting without a jury, held that the vessel was seaworthy and that the injuries sustained by Bryant were not caused by negligence on the part of the vessel's owners or crew.[1] We reverse the district court since, in our view, its judgment rested on a misapprehension of the legal standards of seaworthiness, as fashioned by recent Supreme Court and inferior federal court decisions.
 
 
 2
 The background facts are uncontradicted and quickly stated. On November 24, 1960, Bryant and several co-workers were assigned by their employer, Oriole Ship Ceiling Company, Inc. [hereinafter Oriole], which was under contract with Partenreederei, to prepare hatch No. six of the S. S. Christian Russ for the storage of grain. This was to be accomplished by erecting a grain feeder box in the square of the hatch, extending from the 'tween deck up to the main deck.
 
 
 3
 Unlike most American built ships, the German built S. S. Christian Russ retained on board precut boards with which to construct the feeder box, obviating the necessity of ship ceilers having to cut lumber to size and nail the boards together. By utilizing precut boards of a standard 8' × 6" × 3" size, ship ceilers could insert these boards horizontally into slots on stanchions placed on the 'tween deck and gradually build up the four sides of the box until they extended up to the main deck.
 
 
 4
 Work began around 8:00 A.M. on the day of the accident. Bryant and one Brooks Austin were assigned to work on the main deck. It was their duty to pass the precut boards down to other ship ceilers stationed on the 'tween deck who would then insert the boards into the stanchion slots. After the men on the 'tween deck had built a side up to a height of six or seven feet, they could no longer reach high enough to continue inserting the boards from below. At that point, Bryant and Austin would commence placing the boards in the stanchion slots by leaning over the hatch coaming and inserting them from above.
 
 
 5
 At the time of Bryant's accident, around 11:00 A.M., three sides of the feeder box had been substantially completed; only the starboard side remained to be done in its entirety. Bryant's accident occurred while he and Austin were engaged in completing the aft side of the box. When only a few boards remained to be inserted to finish that side, they discovered that one end of a board would not readily drop flush onto the preceding board and thus become firmly seated in its proper position. Austin thereupon picked up a small board, leaned over the hatch coaming, and attempted to tamp the balky end into place. Austin's efforts were unavailing, and Bryant decided to try his hand. For leverage Bryant stepped up on the foot wide hatch coaming, and, using a larger and heavier board, attempted to drive the stuck end down. After observing that his blows were having the desired effect, Bryant lifted the driving board over his head with intention of striking one final blow. With his arms extended upward, however, Bryant became "overbalanced," and finding himself unable to regain his balance, tossed the driving board into the lower hold and jumped onto the 'tween deck in order to avoid plummeting into the lower hold himself. As a result of the fall, Bryant sustained serious injuries to both feet, required hospitalization and extensive medical care, and was unable to return to work for over a year.
 
 
 6
 The central and completely undisputed fact in this case is that the board that Bryant was trying to drive into position was warped and for this reason would not slide easily into position. It was Bryant's contention at the trial that because of this acknowledged fact, the ship was rendered pro tanto unseaworthy, and since his injuries proximately resulted from an unseaworthy condition, the shipowner should be held liable. Partenreederei strenuously contested Bryant's assertion that the warped board rendered the ship unseaworthy. Partenreederei first pointed out that Bryant had several other alternatives available; e. g., that he might have removed the warped board upon realizing its condition and have chosen another, or that he might have obtained permission from the First Mate and have shaved the balky end to make it fit.[2] Partenreederei further maintained that this particular warped board was no different from those regularly encountered in the ship ceiling trade and that the method chosen by Bryant to force the board into position was customary and proper under the circumstances. Thus, Partenreederei argued that the vessel was seaworthy and Bryant's only cause of action was against Oriole for compensation.
 
 
 7
 In support of its position, Partenreederei elicited testimony from several of Bryant's co-workers that the ship ceiling trade was by its nature a very rough and hazardous calling. These men admitted that ship ceilers must expect to deal with such contingencies as warped boards in the regular performance of their duties.[3] Each recalled several instances when he had been required to deal with similarly warped boards on other vessels. The First Mate testified that warping was inevitable since there was no feasible way to store these precut boards so as to avoid the deleterious effects of damp weather. Finally, several witnesses testified that the method chosen by Bryant to position the board was proper, and indeed, the most satisfactory method under the circumstances.
 
 
 8
 The trial court was obviously persuaded to Partenreederei's view:
 
 
 9
 "[T]he ship's duty is only to have the equipment reasonably safe for the purpose for which it was intended. There is ample testimony to the effect, by all concerned, that the condition, as far as the board was concerned, was a customary and usual one and that it was normal to fit the boards which stuck in this manner by tamping or ramming them into place while standing on the hatch coaming.
 
 
 10
 * * * * * *
 
 
 11
 "So, the court does not find that the ship was unseaworthy in any way whatsoever."
 
 
 12
 In finding the S.S. Christian Russ to be seaworthy, the trial court heavily relied on language in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960):
 
 
 13
 "What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336 [75 S. Ct. 382, 99 L.Ed. 354]."
 
 
 14
 We think the trial court read too much into the Mitchell case. The clearcut holding of that case is that a shipowner's liability for a temporary unseaworthy condition is equally as great as his liability for a permanent unseaworthy condition. The Court added as a caveat the above quoted language to make it clear that a shipowner is not obligated to furnish an accident free ship, but only one reasonably fit for its intended service. It should be noted, however, that the requirement of reasonable fitness is absolute and not subject to implied limitations. We think that the trial court attempted to dilute the standard of reasonable fitness by reading into it two unwarranted limitations, and thus failed to fully appreciate its affirmative aspects. Compare Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4 Cir. 1963).
 
 
 15
 First, we think that the trial court attempted to reintroduce into general admiralty law the now discredited doctrine of assumption of risk. The Supreme Court in Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939), held that a seaman's claim for damages in a Jones Act proceeding was not barred by his deliberate choice of an unsafe appliance. A seaman's conduct may constitute contributory negligence and the shipowner's liability may be thereby mitigated, but the Court there announced that the doctrine of assumption of risk would no longer completely defeat a seaman's recovery. Although Socony-Vacuum Oil Co. v. Smith, supra, was concerned with a seaman's action for negligence under the Jones Act, later decisions have demonstrated that its reasoning and conclusions extend with equal force to seamen's actions for unseaworthiness. See, e. g., Dixon v. United States, 219 F.2d 10 (2 Cir. 1955); Hildebrand v. United States, 134 F.Supp. 514 (S.D.N.Y. 1954); aff'd 226 F.2d 215 (2 Cir. 1955); Mormino v. Leon Hess, Inc., 119 F.Supp. 314 (S.D. N.Y. 1953), aff'd 210 F.2d 831 (2 Cir. 1954). Further, since land based workers performing seamen's duties are afforded seamen's remedies, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), it necessarily follows that their claims likewise are not subject to the defense of assumption of risk. Palermo v. Luckenbach S. S. Co., 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3 (1957); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).
 
 
 16
 Though not denominated as such, we feel that Partenreederei's defense was in essence the defense of assumption of risk. Partenreederei developed the point through testimony of several witnesses engaged in the ship ceiling trade that warped boards are a common occurrence in constructing grain feeder boxes, and that although the task is made more difficult thereby, a way must be found to get the job done. Claborne Taylor, a gang carrier employed by Oriole, when asked what happened when the boards couldn't be hammered in, stated: "We get paid to hammer them in, we're going to get it in if it's going * * *." Record, p. 37. Thus it seems clear that ship ceilers are regularly expected to employ tactics such as those employed by Bryant here. We feel, however, that it would be unjust to say that when these tactics lead to injury, as they did in Bryant's case, the shipowner may escape liability by pleading that the worker was doing that which he was required to do. Where a shipowner fails to abide by his duty to furnish his workers with safe appliances and a safe place in which to work, he must face the resulting consequences. He may call the tune, but he also must pay the piper. Seas Shipping Co. v. Sieracki, supra; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).
 
 
 17
 Additionally, we think that the trial court attempted to limit the standard of reasonable fitness by erroneously interpreting it to mean fitness as determined by prevailing customs of the trade. This is demonstrated by the language of the trial court that the S. S. Christian Russ was deemed seaworthy because it was "as fit for service as similar vessels in similar service." It is an established principle, however, that in negligence actions under the Jones Act, prevailing trade customs cannot furnish the legal standard of due care. See, e. g., Troupe v. Chicago, D. & G. B. Transit Co., 234 F.2d 253 (2 Cir. 1956). This being true, we fail to perceive any logical reason why trade customs should be permitted to form the legal standard of seaworthiness in actions under general maritime law. Compare Rodriguez v. Coastal Ship Co., 210 F.Supp. 38 (S.D.N.Y. 1962), where oil spillage from a new and experimental gantry crane used in cargo loading operations, although inevitable, was held not to bar a longshoreman's claim for unseaworthiness. Similarly, in the case before us, we see no reason why the shipowner's asserted inability to prevent precut boards from warping should bar Bryant's claim for unseaworthiness, even though every vessel utilizing precut boards may experience the same difficulty.
 
 
 18
 The real thrust of Partenreederei's defense was that the warped board that Bryant was forced to deal with was no more warped and ill-suited for the purpose of constructing a grain feeder box than those found on other vessels utilizing precut boards. From this, it argues that the S. S. Christian Russ was reasonably fit for its intended service and, therefore, seaworthy. Following this line of reasoning, a shipowner could escape liability for unseaworthiness whenever his ship's gear and appurtenances were no worse than those of similar vessels, no matter how low the universal standard might be. At best, evidence of prevailing industry standards may be considered as some evidence that the ship in question is in fact seaworthy. It may never be conclusive. Any other view would be at odds with Mr. Justice Rutledge's admonition that the duty to provide a seaworthy ship and appurtenances is "a form of absolute duty owing to all within the range of its humanitarian policy." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946).
 
 
 19
 The judgment of the district court is set aside and the case remanded with directions to enter judgment for the plaintiff in an amount to be determined by the said district court.
 
 
 20
 Remanded.
 
 
 
 Notes:
 
 
 [1]
 In light of its judgment, the district court quite correctly dismissed as moot Partenreederei's claim for indemnity against Oriole Ship Ceiling Company, Inc. [hereinafter Oriole], Bryant's employer, and also Oriole's claim for indemnity against Bryant. Partenreederei's claim against Oriole would have been pertinent only if Partenreederei had been held liable to Bryant. Oriole's claim against Bryant, in turn, would have been pertinent only if it had been required to indemnify Partenreederei. These claims will have to be reconsidered upon a new trial
 
 
 [2]
 The record reveals, however, that these suggested alternatives would have presented some inconvenience. Once partially inserted, a warped board could be removed only by utilizing a winch to wrest the board free from its stuck position. Also there was testimony that the precut boards were not to be shaved by ship ceilers, out of fear of weakening them. In any event, they could be shaved only upon obtaining permission from one of the ship's officers
 
 
 [3]
 The testimony of Claborne Taylor, a gang carrier in the employ of Oriole, is revealing on this point:
 "Q. Before the accident, did any of your men complain to you about any of these boards, Mr. Taylor?
 "A. No, sir, they didn't — ain't supposed to complain, they're supposed to put the boards in like they are told to, they don't get paid to complain.
 "Q. Well, ship ceilers do occasionally complain about something, don't they?
 "A. Well, they may complain, but not to me.
 "Q. Well, if they are going to complain about anything to do with their working conditions, you are the man to complain to?
 "A. No, sir, they go to the Union Hall to complain." Record, p. 39.
 
 
 BOREMAN, Circuit Judge (dissenting):
 
 21
 I cannot concur in the majority opinion. This case was presented to the District Judge, sitting as the trier of fact without a jury. He found, as facts, that the ship was not unseaworthy and that the defendant was not negligent. In an oral deliverance from the bench, the court stated:
 
 
 22
 "Plaintiff further testified that he had no difficulty in getting up on the coaming and that there was nothing unusual about getting up on the coaming. All testified that it was the usual and customary manner in which this type of work was done on feeder boxes.
 
 
 23
 "Plaintiff states he had the correct board, and repeated this, and that it was no different from any other board that stuck on occasions, but that it had to be driven in."
 
 
 24
 * * * * * *
 
 
 25
 "There is no testimony here that this particular board was unseaworthy, and the ship's duty is only to have the equipment reasonably safe for the purpose for which it was intended. There is ample testimony to the effect, by all concerned, that the condition, as far as the board was concerned, was a customary and usual one and that it was normal to fit the boards which stuck in this manner in by tamping or ramming them into place while standing on the hatch coaming."
 
 
 26
 * * * * * *
 
 
 27
 "* * * But according to the plaintiff's own testimony, the board fitted well enough to be driven in so that he gave no thought to taking it out. * * *"
 
 
 28
 * * * * * *
 
 
 29
 "It just appears to be one of those unfortunate instances that happens on the waterfront where a person sustains an accident and for which, of course, he can recover under the Longshoreman's Act.
 
 
 30
 "So, the Court finds for the defendant ship. It was not unseaworthy, nor was it negligent." (Emphasis mine in the above quotations.)
 
 
 31
 There was abundant evidence in the way of testimony by the injured plaintiff himself and by his fellow longshoremen that the condition of the board was a customary and usual one and that the board fitted well enough to be driven in by following the generally approved practice which was described as reasonably safe. The duty of the owner is to furnish a vessel and appurtenances reasonably fit for their intended use. That principle is particularly apposite here and, in my opinion, was followed and applied by the District Court notwithstanding certain language employed by the court in orally announcing its findings and opinion at the conclusion of the trial.
 
 
 32
 Concluding, as I must, that the findings with respect to seaworthiness and negligence are supported by substantial evidence, I would affirm.