James E. VENABLE, Plaintiff,

v.

A/S DET FORENEDE DAMPSKIBS-SELSKAB, Defendant.

Civ. A. No. 4779.

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 10, 1967.

---

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

Walter B. Martin, Jr., Norfolk, Va., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, District Judge.

This matter stands on plaintiff's motion to set aside the verdict of the jury as contrary to the law and the evidence and to direct a verdict for the plaintiff notwithstanding the jury verdict in favor of the defendant or, in the alternative, to grant a new trial. Due to the many issues raised by plaintiff during the course of trial, it is deemed appropriate to deal with same by this memorandum. As counsel for plaintiff challenged the array at the outset of the trial, the memorandum will discuss (1) the trial, including alleged errors in the charge and miscellaneous contentions, and (2) the challenge to the array.

## THE TRIAL

This case was originally scheduled for trial on June 18, 1965. By agreement of

counsel, it was rescheduled for July 15, 1965. On June 15, 1965, after the July date had been selected, counsel for plaintiff advised that the plaintiff's two treating physicians would not be available on July 15, 1967, and the case was again rescheduled for trial on January 14, 1966, which was the earliest date available. The matter was heard before a jury on January 14–15, 1966, same resulting in a verdict for the defendant. Between July, 1965 and January, 1966, a new group of jurors had been called for service.

Plaintiff, a longshoreman employed by Old Dominion Stevedoring Corporation,[1] was injured while working aboard the M/V OKLAHOMA, owned by the defendant, on April 20, 1964, at Newport News. The stevedore had contracted with the shipowner to stow a cargo of hogsheads of tobacco aboard the vessel. Plaintiff contends that the walking and working surface was insufficient and dangerous due to inadequate lighting and no use of dunnage.

On the morning of the accident, at some time between 10:00 and 11:00 A.M., the No. 4 hatch was slightly more than half open.[2] There was no artificial lighting in the 'tween deck area where the accident occurred. The longshoremen depended on the natural light coming through the loading hatch. The witnesses had different versions as to the lighting conditions. Some characterized the condition as "poor", while another described the same as "fair" to "good" in and around the square of the hatch, but "poor" under the wings. The latter witness, Joseph Hollomon the gang boss, was confronted with his prior discovery deposition in which he said that the lighting was sufficient as far as he was concerned, although it does not appear that this witness was in the 'tween deck at the moment of the accident.

It was conceded by the witnesses that it was not unusual for some small space to be left between the rows of hogsheads in stowing them. Plaintiff contended that the shipowner should have provided dunnage to cover up these spaces for the purpose of preventing falls between the hogsheads. There was conflicting evidence as to whether dunnage was ever used for this purpose. Without detailing the evidence, the jury had ample credible testimony to sustain a finding that dunnage was not customarily used or required in situations presented herein—as contrasted with stows when the hogsheads may be several feet apart.

While the greater number of witnesses referred to "poor" lighting,[3] the credibility of the witnesses was for the jury. The plaintiff and his two fellow-longshoremen who testified in his behalf all said that, at the time of the accident either three tiers of hogsheads had been stowed in the 'tween deck and a fourth was in the process of being stowed,[4] or that two tiers had been stowed and they were working on the third. However, a marine surveyor who measured the hatch

---

1. Old Dominion Stevedoring Corporation was joined as a third-party defendant by the shipowner. Ultimately the stevedore took over the defense of the action in the name of the shipowner. This is a familiar practice in indemnity actions of this type.

2. The gang boss testified that the hatch consisted of 3½ sections and, on the day of the accident, 2 sections were open. Actually, the hogsheads were only being stowed in the forward half of the hatch.

3. One longshoreman described the lighting as "poor, very poor". Another indicated that he had not seen the space where plaintiff fell because he did not pay any attention to it, but he did say

that the light diminished as the tiers increased and as the longshoremen went further back in the wings. The plaintiff testified that he could not see anything under his feet.

4. The witness, Harris, refers to rolling a hogshead up on boards a distance of 4 feet (the height of one tier). If this is correct only one tier had been stowed and the longshoremen were in the process of stowing the second tier when plaintiff was hurt. Apparently the hogshead had been rolled up to the second tier and the longshoremen (including plaintiff) were engaged in pushing the hogshead in place when plaintiff stepped between the hogsheads on the first tier.

testified that slightly less than 10 feet vertical space was available in the 'tween deck, and each hogshead measured approximately 4 feet in height. The latter testimony, if accepted, tends to discredit the plaintiff and his liability witnesses, but it also may discredit the stevedore foreman who stated that three tiers of hogsheads were loaded in the vessel.[5]

A fellow longshoreman, Harris, on cross-examination, placed the point of the accident close to the edge of the square of the hatch [6] and not back under the wings.

■ The plaintiff admitted that, at the time of the accident, he didn't have any trouble seeing to do his work. He gives a rather inept description of how he stepped when assisting another man in rolling the hogshead, but concedes that he stepped either sideways or backwards. He claims that he did not have time to look "because the hog was coming back". The jury could have concluded that the lighting, even if inadequate, was not a proximate cause of the accident. Indeed, there is nothing to preclude the rejection of uncontradicted testimony. Scates v. Isthmian Lines, Inc., 319 F.2d 798 (9 Cir., 1963); Ramos v. Matson Navigation Company, 316 F.2d 128, 132 (9 Cir., 1963).

Issues of negligence, unseaworthiness, and proximate cause were submitted to the jury. The jury could properly find for the defendant if we accept the testimony in the light most favorable to the defendant.

### THE CHARGE

■ Plaintiff complains of the charge wherein, after telling the jury that the warranty of seaworthiness "includes an obligation to furnish a stowage reason-

ably fit for its intended purposes", the Court said:

"In that connection, with respect to the stow of these hogsheads, you may consider what was usual and customary in the standards adopted in the trade for the purpose of determining whether the vessel was or was not seaworthy and whether the defendant was or was not guilty of negligence, but such custom and practice in the trade is not conclusive or binding upon you.

"The mere fact that there was an empty space between some of the hogsheads of tobacco comprising the stowage on board the OKLAHOMA is not enough, standing alone and by itself, to constitute an unseaworthy condition."

Plaintiff's claim of vice in this portion of the charge is twofold. He contends that any mention of what is customary in the standards adopted in the trade constituted error, relying upon Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185 (4 Cir., 1964). To the contrary, this portion of the charge coincides with the language of *Bryant* where it is said:

"At best, evidence of prevailing industry standards may be considered as some evidence that the ship in question is in fact seaworthy. It may never be conclusive."

The latter portion of the quoted charge relates to the statement that merely because there was an empty space between some of the hogsheads is not enough, *standing alone,* to constitute an unseaworthy condition. To otherwise charge the jury would make the shipowner a guarantor of the safety of anyone in the area. This portion of the charge is supported by Nuzzo v. Rederi, A/S Wallenco, Stockholm, Sweden, 304 F.2d 506 (2 Cir.,

---

5. The marine surveyor testified that, in the square of the hatch, it is possible that three tiers could be stowed.

6. The witness, Harris, said that when plaintiff was hurt, "he came on up, but we didn't have about four or five more and didn't think that, you know, he was hurt that bad * * *" The inference

from this testimony is to the effect that the stow in the wings had been substantially completed, and the longshoremen were nearing the square of the hatch. Especially is this true when the exhibit marked by Harris indicates that the accident occurred practically at the forward end of the square of the hatch.

1962). The situation here presented is not analogous to falling into an unlighted hatch or hole in the deck. The purpose of stowage, as described in *Nuzzo*, "is a disposition of cargo within the vessel which will be *reasonably* safe and convenient both for carriage at sea and for unloading at the destination". Plaintiff's reliance upon Strachan Shipping Co. v. Alexander, 311 F.2d 385 (5 Cir., 1962), is misplaced. When we examine the opinion of the trial court, Alexander v. Meiji Kaiun K.K., 195 F.Supp. 831 (E.D.La., 1961), we find that the hole in which the longshoreman fell was large enough to receive his body and, according to all of the testimony, was required to be covered by dunnage. That is a far cry from the instant case. The issue as to whether the stow of the hogsheads was faulty, or faulty by reason of the lack of dunnage if the same was necessary, was submitted to the jury and decided contrary to plaintiff's contentions.

Plaintiff urges that the Court overemphasized the terms "reasonably fit for [its] intended use" throughout the charge. Of course, this is the language used by the Supreme Court in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S. Ct. 926, 4 L.Ed.2d 941 (1960), as well as in many other cases defining seaworthiness. In Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4 Cir., 1963), the vice of the charge was in telling the jury that unseaworthiness could not occur *without fault of the shipowner*, and this incorrect statement of law, coupled with "repetitive insistence" that the equipment need be only reasonably fit for the purpose for which it was being used, failed to distinguish the warranty of seaworthiness from the concept of negligence. There was no error in using the term "reasonably fit for [its] intended use" in the present case, especially where the jury was likewise told that the shipowner's duty was absolute and non-delegable.

■■ The next complaint registered by plaintiff is to that portion of the charge which says:

"Moreover, if you should conclude that this accident was the result of the man-

ner in which the plaintiff and his fellow longshoremen performed their duties on board the vessel and that this was the efficient cause of the accident *to the entire exclusion of any negligence of the defendant or any unseaworthiness of the vessel,* then, in that event, there would be no liability that could be imposed upon the defendant under such circumstances."

It is contended by plaintiff that this language is in direct contradiction with Scott v. Isbrandtsen Company, 327 F.2d 113 (4 Cir., 1964). To the contrary, the charge in *Scott* was given by the same trial judge who wanted to test the vitality of his own prior ruling in Holley v. Manfred Stansfield, 186 F.Supp. 212 (E.D. Va., 1960)—a case that was not appealed —wherein the longshoreman who created and brought into play the unseaworthy condition was permitted to recover. Moreover, in *Scott*, the special interrogatory was held to be confusing, ambiguous, and not sufficiently explained to the jury. Counsel for plaintiff herein overlook the words *"to the entire exclusion of any negligence of the defendant or any unseaworthiness of the vessel"*. They likewise disregard a later portion of the charge which reads:

"If an unsafe condition existed on the vessel and if, in your opinion, such unsafe condition constituted unseaworthiness, no matter for how short a time, and if that unseaworthiness was created or did come into play by reason of the stevedore or its longshoremen, then if you further believe that such unseaworthiness was a proximate cause of the plaintiff's injuries, the defendant is liable.

"What I am speaking to you there about is that a longshoreman may himself create an unseaworthy condition of the vessel. I do not suggest to you that that happened in this situation. I am just saying to you that we come back to the word 'unseaworthiness'. What is it? The question is whether the vessel and all of its appurtenances, and so on, were reasonably fit for its intended use. "

Plaintiff urges that *Scott* imposes absolute liability upon the shipowner wherever the accident is due to operating negligence of the longshoremen. We disagree. Such operating negligence may create a condition of unseaworthiness for which the shipowner is liable but, absent unseaworthiness and negligence of the shipowner, mere operating negligence of longshoremen, *standing alone,* does not make the shipowner liable. Penedo Cia Naviera S.A. v. Maniatis, 262 F.2d 284 (4 Cir., 1959), is an opinion by Judge Soper where the question was squarely presented, and, in reversing this trial court, it was held that the doctrine of unseaworthiness does not include negligent operation of seaworthy equipment. Operating negligence by fellow longshoremen, *standing alone* and not giving rise to an unseaworthy condition of the vessel (including the cargo), does not permit a recovery unless, of course, the shipowner has notice of such operating negligence in time to have prevented same.

A more recent case touching upon the "operating negligence" theory is Burgess v. Farrell Lines, Inc., 335 F.2d 885 (4 Cir., 1964), wherein a longshoreman was injured while guiding or pushing a grab bucket into position over ore being unloaded from a vessel, during which time the longshoreman was assisted by three fellow longshoremen. Circuit Judge Boreman—the author of the *Scott* opinion—had this to say:

"All of the gear furnished by the ship and by the stevedore was in proper working condition. Burgess contends, however, that the manner of using the gear was unsafe which not only rendered the ship unseaworthy but constituted negligence on the part of the ship's officers and agents as a breach of their duty and obligation to supervise unloading operations. In the face of an adverse finding that the use of the gear and equipment was safe, reasonable and proper under the circumstances, which finding is supported by competent evidence, plaintiff's contentions as to unseaworthiness and negligence are without foundation and must fail."

What is applicable to gear and equipment is similarly applicable to cargo.

Recently called to the Court's attention is the five-line opinion of the Supreme Court in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (May 22, 1967). With three justices expressing the view that certiorari should be denied, the majority granted certiorari and reversed the *per curiam* decision of the Third Circuit, 358 F.2d 133, with the Supreme Court citing Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, and Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. *Mascuilli* has a peculiar history. The first opinion, D.C., 188 F.Supp. 754, resulted in the district court determining the issue of liability in favor of the longshoreman predicated solely upon the pretrial order. The trial, confined to damages only, resulted in a decree awarding $124,000. On appeal, 313 F.2d 764, the district court was reversed with instructions to hear and consider the evidence as to the issues of liability and damages. On remand, the case was heard by a different district judge, D.C., 241 F.Supp. 354. Extensive findings were filed but, for the purpose of this discussion, it is sufficient to note that the district judge held:

"The accident was caused solely by the negligent operation of the stevedoring crew using seaworthy equipment in such a manner as to cause the accident to occur so instantaneously that the Third Officer was unable to warn anyone or prevent its happening.

Following the *per curiam* affirmance, 358 F.2d 133, the Supreme Court reversed. At first blush it may appear that the Supreme Court has now ruled that operating negligence, *standing alone,* is sufficient to support a recovery. However, a study of the factual situation in *Mascuilli,* coupled with an examination of the authorities cited by the Supreme Court, does not support this conclusion. The district judge who heard the merits of the case concluded that the sole proxi-

mate cause of the accident was the excessive strain placed on the shackle by the negligent manner in which the longshoremen operated the ship's winches. The reversal by the Supreme Court was obviously based upon *Crumady* where the winch had a safe working load "cut off" device and the ship's personnel had set this "cut off" device at approximately twice the safe working load. *Crumady* held that this act constituted an unseaworthy condition which was "brought into play" by the operative negligence. In short, *Crumady* follows the Holley v. Manfred Stansfield doctrine. In *Mascuilli*, the ship's personnel installed the shackle which had a safe working load rated at 50 tons, which was less than the weight of the 60¼ ton tank being loaded into the vessel. We cannot conclude from the five-line opinion in *Mascuilli* that the Supreme Court intended to make operating negligence of a longshoreman, *standing alone* and without unseaworthiness, a basis of recovery.

A point not argued in brief, but perhaps pertinent for consideration—as plaintiff excepted to same—is that portion of the charge which stated that the shipowner was presumed to be free from negligence and the vessel was presumed to be seaworthy. This charge has been given for many years and was so stated in *Scott* without criticism by the appellate court. The recent case of Sanderlin v. Martin, 373 F.2d 447 (4 Cir., 1967)— in which counsel for the present plaintiff were successful—admittedly casts some doubt as to the propriety of charging the jury as to any presumption, other than presumptions created by statute. *Sanderlin* was an automobile accident involving a rear end collision in which the Court of Appeals, relying upon a state court decision rendered after the judgment in *Sanderlin*, held that a *prima facie* case of negligence was sufficient to defeat an existing presumption. There is language in the dissenting opinion of Chief Judge Haynsworth intimating that

a jury should rarely, if ever, be instructed in terms of presumptions, and that the term is useful only in the hands of the court for the purpose of fixing and shifting the burden of going forward with the evidence. Since *Sanderlin*, this Court has been cautious as to the use of the word "presumption" in charging all juries.[7] However, in reading the entire charge it is clear that the use of the word "presumption" cannot constitute error in this case.

■ Indeed, in an examination of the total charge, it is obvious that, if anything, it was favorable to the plaintiff. The Court ruled, and so told the jury as a matter of law, that the plaintiff was not guilty of any contributory negligence. In a further examination of the transcript, the Court is not certain that it was correct on this point. The jury was also told that the plaintiff did not assume the risk of any unseaworthy condition or any negligence on the part of the shipowner which, of course, is a correct statement of the law.

We find that there was no error in the charge.

### MISCELLANEOUS ISSUES

In November, 1964—about seven months after plaintiff was injured in the shipboard accident—plaintiff was involved in an automobile accident. On cross-examination of plaintiff, counsel for defendant properly interrogated plaintiff as to the extent of injury to plaintiff's back which may have been caused or aggravated by the automobile accident. Later in the cross-examination, plaintiff was asked whether he had filed a claim for compensation on the ground that he was unable to work as a result of the automobile accident on November 17, 1964. Plaintiff was obviously evasive in his answers relating to the extent of his injury from the unrelated automobile accident. To the question concerning any claim for compensation relating to the automobile accident, plaintiff replied,

7. We do not understand the admonition against the presumption rule to include a criminal case where the accused is presumed to be innocent. Yet this is not a statutory presumption.

"You have to ask my lawyer about that. I don't know". After considerable colloquy between court and counsel, the jury was excused and the purported claim for compensation benefits was examined. It developed that the claim was filed with the Hampton Roads Maritime Association, I L A, Welfare Fund. Before the jury retired, the Court made the following statement:

"I will tell the jury that if this man was injured in an automobile accident in November of 1964, as he apparently was, that that has nothing to do with this case except to the extent, if any, that it may affect the various weeks or days, as the case may be, that he may have been disabled after the automobile accident, but if, by reason of the automobile accident, he may have recovered one million dollars, it does not have anything to do with the case, except to the extent that I limit it."

Subsequently, plaintiff's attending physician following the automobile accident of November 17, 1964, was examined at length relative to plaintiff's injuries sustained in the unrelated accident. Thereafter, when counsel for defendant attempted to introduce the testimony of the representative of Hampton Roads Maritime Association with respect to plaintiff's claim for compensation, the jury was again excluded and the Court sustained the objection of counsel for plaintiff. Another colloquy ensued as to what the Court should tell the jury and, after the Court intimated what language should be used, plaintiff's counsel was not in complete agreement. Thereupon, the Court invited counsel for plaintiff to write out what, if anything, should be told the jury on this aspect of the case. Nothing was submitted.

We think it clear that the jury could not have misunderstood the ruling of the Court. Moreover, no further amplification of the ruling was requested. Plaintiff's reliance upon Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963), is misplaced. That case held that introduction in evidence of compensation benefits paid under the Longshoremen's and Harbor Workers' Compensation Act *for the precise injury or accident* constituted error. This has universally been the rule and has been followed by this Court long prior to *Tipton.*

During the opening statement of counsel for defendant, reference was made to the defendant being a "small shipping company" having "one vessel". There was no objection by plaintiff's counsel. Counsel for plaintiff, in his opening statement to the jury, had gone beyond the bounds of propriety in referring to the shipowner's right to recover over against the stevedoring company—a factor that had been removed from the case by reason of the stevedore taking over the defense of the case in the name of the shipowner. At the last of plaintiff's rebuttal evidence, counsel for plaintiff attempted to introduce in evidence Lloyd's Registry of Shipping. In so doing, plaintiff's counsel stated, in the presence of the jury, that the Danish shipowner owned and operated 71 vessels. The objection was sustained, and the Court told the jury:

"Now, may I say that in that connection—and this is the trouble—lawyers get talking too much in their opening statements. Mr. Rabinowitz went far beyond what he should have done, and then Mr. Martin came back and talked about a small shipowner. You haven't got a thing to do with that. I don't care whether it's a small shipowner or whether it's the greatest and largest shipping fleet in the world. You haven't got a thing to do with that. So that's all Mr. Kelsey wanted that information for.

"Mr. Kelsey: That's all.

"The Court: I do not know what the situation is, but you haven't got a thing to do with it. Whether it is the smallest shipowner in the world or whether this shipowner owns 5,000 vessels, it hasn't got a thing to do with this case. Unfortunately, one lawyer went a little bit too far in his opening statement, so the other lawyer takes advantage of it, and had there been an

objection raised as to either one of them, I would have stopped them short right in the middle of it, because they were both going to town, so to speak, but I did not have a chance to stop them because neither one objected."

Plaintiff cites no authority in support of any alleged error in refusing to admit Lloyd's Registry of Shipping in evidence. The point is frivolous.

■ During the course of cross-examination of defendant's expert witness, Hughes, counsel for plaintiff sought to introduce in evidence the book entitled "Modern Ship Stowage", with particular reference to one sentence reading, "The empty spaces in the wings are to be filled with dunnage". The statement is, of course, out of context. The jury was excluded when plaintiff's counsel approached the bench, handed the book to the Court, and then started to read aloud from the book while looking over the Court's shoulder. The matter was thoroughly explored in the absence of the jury. The Court granted permission to question the witness in the presence of the jury with respect to any interpretation of any statement in the book, but refused to admit the book in evidence. When the jury returned, counsel for plaintiff did not elect to question the witness any further. The authority relied upon by plaintiff, Lawrence v. Nutter, 203 F.2d 540 (4 Cir., 1953), is inapposite. When counsel for plaintiff cross-examined the witness as to the use of dunnage over the top of hogsheads, the Court stated that the jury should be permitted to hear the testimony but, when the jury returned, counsel then stated that he had no further questions. In short, plaintiff merely wanted the book in evidence which contained an *underlined* statement taken out of context. To permit such evidence would strip the trial court of any discretion in controlling the use of textbook material, and would unduly emphasize the underlined sentence

—a violation of the principle announced in Lawrence v. Nutter, supra.

## THE VOIR DIRE EXAMINATION OF JURORS

■ After an extensive voir dire examination by the Court,[8] counsel for plaintiff requested permission to examine the jurors generally. Suspecting that the subject of insurance was about to be injected into the case—for the obvious reason that the overall panel of jurors had been returning verdicts for defendants in other cases—the jury was asked to retire. Counsel for plaintiff stated that he intended to ask the jurors whether they were interested in, connected with, or related to the business of selling or handling liability insurance and claims. Of course, the occupation of the prospective jurors was clearly revealed by the juror forms returned to the Clerk, all of which was known by counsel for plaintiff.

Plaintiff relies upon Kiernan v. Van Schaik, 347 F.2d 775 (3 Cir., 1965). Since the final argument on plaintiff's motions, the Fourth Circuit has disapproved the holding in Kiernan v. Van Schaik, supra. See: Langley v. Turner's Express, Inc., 375 F.2d 296 (4 Cir., March 20, 1967). In light of the question propounded to the jurors by the Court, together with the obvious knowledge by plaintiff's counsel as to juror occupations, we think it sufficient to terminate this discussion on this point by resting upon *Langley*.

A voir dire examination of the prospective jurors, Harry Fruit and T. W. Babb, was permitted at the insistence of plaintiff's counsel. Neither juror was disqualified for cause for reasons apparent from the record. Neither juror served on the panel trying the case, as they were stricken by counsel for plaintiff, 31 Am. Jur., Jury, § 202, p. 171.

■ It should be noted that plaintiff and defendant were each granted four

---

8. Included among questions asked of prospective jurors was the following: "Now, may I ask all of you by reason of whatever your present or past occupation may have been, would that in any way affect you in determining the rights of the plaintiff and defendant in this case?"

peremptory challenges as a total of twenty jurors was available. One juror was excused for cause by reason of his distant relationship to counsel for defendant although, in Garland v. United States, 182 F.2d 801 (4 Cir., 1950), it was said that the fact that a sister of one of the jurors was married to an uncle of the Assistant United States Attorney who presented the case was a contention so lacking in merit as not to justify discussion. Relationship of a juror to a participating attorney does not, *per se,* disqualify a juror. 31 Am.Jur., Jury, § 197, p. 169.

## THE CHALLENGE TO THE ARRAY

We turn to plaintiff's final point which attacks the method of selection of jurors generally, both for the master jury box and the individual panel for each case.

Names are selected and approved for the master jury wheel by the jury commissioner and clerk. The physical act of typing the names for insertion into the wheel was generally done by a female deputy clerk. A separate card index of all names placed in the wheel was likewise prepared and maintained. Blue cards are maintained for women; white cards for men. On some of the cards the letter "C" appeared, indicating that they were members of the colored race.[9] The individual slips which are placed in the jury wheel bear no identification indicating the race of the juror and are all on white paper. The deputy clerk selected a few names which were ultimately approved by the jury commissioner and, as to these, the selections were at random from a city directory.[10] Neither the card index nor the slip reveals the occupation of the juror whose name is placed in the master wheel.

Other than the few names selected at random by the deputy clerk, the bulk of the names selected prior to 1954 and still in the box was provided through the use of what has been called the "key-man" system. Such a procedure has been approved by the Judicial Conference of the United States and, until recently under attack by the Department of Justice, has been considered the recommended procedure throughout the nation. See: Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 428–429. The "key-man" system denotes that names are obtained from various organizations, employers, Parent-Teacher Associations, civic clubs, including organizations with predominantly or all-Negro members.

The jury commissioner selected in 1956 testified that additions to the master wheel were taken mainly from city directories. In some instances the jury commissioner knew the person selected. In others he did not.

While no effort has been made to analyze the 91 juror forms returned to the clerk for the overall panel available during the time this case was tried—and indeed no proper analysis could be made without a detailed study of all names in the jury wheel—a glance at the 91 forms does not reflect that jurors are confined to the "white collar" class as urged by counsel for plaintiff. Such occupations as chauffeur, housewife, farmer, small business man, civil service employee (Naval Supply Center), minister's secretary, working for newspaper, draftsman, superintendent of services (doorman) at private club, machine specialist, printer, florist, investigator at Naval Station, leadingman stockman (Naval Supply Cen-

9. At the suggestion of the Administrative Office, the practice of designating a person as "colored" was stopped on an unknown date. It is now impossible to tell how many names of Negro citizens are in the master wheel. The authorities in Washington have difficulty in determining what practice should be followed.

10. Voting registration lists, considered most generally acceptable in recent legislation pending before Congress, have not been available due to the expense involved. Authority has now been given (within the past 12 months) for the Clerk to purchase these lists, and the Clerk of the United States District Court for the Eastern District of Virginia is now procuring same for all four divisions.

ter), auto repairman, Post Office mechanic, janitor, sign painter, plant pathologist, barber, clerk at Post Office, machinist, refrigeration and air conditioning mechanic (Norfolk Naval Shipyard), timekeeper, tavern owner, mortician, and trainman, would not indicate that any attempt has been made to avoid a cross section of the community as required by law. Certainly it is a far cry from suggesting that there has been a systematic and intentional exclusion of particular groups which is the vice as stated in Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181. Among the 91 selected for jury service, it is true that there were a number whose occupations were insurance and real estate, but this is the "luck of the draw". Obviously, plaintiff's attorney would prefer seeing all insurance and real estate agents excluded, but this would require legislative action and, if the Court otherwise excluded them, it would be a violation of the principles stated in *Thiel.*

While the estimate of the number of Negro names in the master wheel only indicates 174, there has been a period of time during which the letter "C" has not been used. The deputy clerk estimated the percentage of Negro names at 20 to 25%, which estimate was made prior to the computation made on March 3, 1966. Obviously the percentage was not that high. Nevertheless, there has always been an estimated 20% Negro jurors serving. Perhaps this is due to the fact that fewer Negro jurors request excuses from service.[11] As to the overall panel called for service during the period covering the time this case was tried, it appears that only twelve cards bear the letter "C" indicating that they are of the Negro race. How many others, if any, were Negroes is unknown as some may have been added during the period when the clerk ceased to identify the names by race. Checking plaintiff's exhibit No. 5 showing the cards bearing the letter "C", we find that the follow-

ing jurors were selected for the period in question and who are Negroes: Louis C. Bell, Ida M. Baker, James H. Brooks, Charles Deane, Moses Davis, Thomas J. Fountain, Henry Jenkins, Clayton J. Miller, Wiliam H. Ragsdale, Dorothy C. Reid, Lillie Sloane, and Franklin Thornton, Sr.

██ Plaintiff contends that there has been a violation of 28 U.S.C. § 1864 because the qualifications of the particular juror are unknown until there has been a drawing from the box and a juror questionnaire is forwarded to each juror. Hence, plaintiff argues, there is no showing that the box contained "the names of not less than three hundred qualified persons at the time of each drawing". However meritorious the contention may be, the juror cards carry the notation "out" for each period of time the juror is called to serve. Many of these jurors have already completed the juror questionnaire on a prior occasion and are presumptively qualified. A check of these cards and previously submitted questionnaires would clearly indicate that there are many more names of "qualified persons" in the jury wheel than the statutory requirement of three hundred. To hold that before each public drawing a determination of qualification is required would mean that the qualifications of 1800 to 2000 names must be checked in person to ascertain whether at least 300 are qualified. It would require the personal presence of all persons whose names are in the master juror wheel and a contemporaneous public drawing. There would be no other way to comply as a person may be qualified on a particular date, but later become disqualified by reason of the commission of a felony or his inability because of physical or mental infirmities to render efficient jury service. That there is a division as to the procedures adopted by various districts in sending out the juror questionnaire before actually being drawn for service and after the name is drawn is admitted. The Report of the Judicial Conference Committee on the Operation of the Jury

11. While not applicable to this case, the Norfolk Division is now being served by

a Negro jury commissioner who is a retired principal of a high school.

System submitted in September, 1960—26 F.R.D. 411, 439–440—indicates that, of the 90 districts responding to inquiry, 58 districts sent out questionnaires to jurors before the prospective juror was called for service, whereas many other districts sent the questionnaire out after the juror's name was drawn for service. The latter method has been followed in the Eastern District of Virginia for many years. It is noteworthy that the Committee on the Operation of the Jury System has not condemned this practice. When the questionnaires are returned to the clerk, they are then checked, to the extent possible, with respect to the basic qualifications. If a question arises in the clerk's mind from information revealed on the questionnaire, the matter is referred to the judge.

The jury commissioner testified that attempts were made to ascertain whether suggested names of prospective jurors met the necessary qualifications. Undeniably, without a comprehensive reference to a master, it would be impossible to ascertain what portion of the 1746 names in the jury wheel were "qualified" as of the date of the drawing. However, the questionnaire returns from prior jury service would adequately demonstrate that well in excess of 300 qualified names were in the jury wheel at the time the overall jury panel was drawn by the clerk and jury commissioner.[12]

 An attack is made upon the method adopted in physically placing the names in the jury wheel. Both the clerk and jury commissioner selected names for insertion into the box. Lists of names were prepared but the physical act of preparing the slip containing the juror's name was left to the deputy clerk. There was agreement as to the names to be deposited by the deputy clerk. Certainly this was a technical deviation from the statute, but we think that it is sufficiently answered by Chance v. United States, 322 F.2d 201, 207 (5 Cir., 1963). The purpose of the requirement is to give both the clerk and jury commissioner an equal opportunity to place names in the box. The statute does not require that the two officials be present at the same time, or that all names be placed therein in the presence of each other. Where there is agreement between the clerk and jury commissioner as to the names to be placed in the box, it is at best a technical deviation to say that the physical act of putting the name in the box constitutes error.

 The third point in the challenge to the array rests in the long existing practice permitting the clerk or deputy clerk to rotate, as nearly as practicable, the service of the individual jurors. Thus, among the 91 qualified jurors selected for a specific overall period of service, the deputy clerk attempts to equalize the service of all jurors, thereby eliminating any undue burden upon particular jurors. The statute does not prohibit such a procedure. We do not agree with plaintiff's suggestion that the jurors should be directed to report for a particular case in the order in which they are drawn from the jury box. Once there has been a drawing by lot, there is no federal statute or rule of court requiring a subsequent drawing by lot. Albizu v. United States, 88 F.2d 138 (1 Cir., 1937), cert. den. 301 U.S. 707, 57 S.Ct. 940, 81 L.Ed. 1361; Cain v. United

12. In United States v. Brandt, 139 F.Supp. 362 (N.D.Ohio, 1955), this question is considered with the court discussing the predecessor statute, 28 U.S.C. § 412, which later became 28 U.S.C. § 1864. In that case only 353 names were in the jury box. The court held that the burden rested upon the party attacking the procedure to prove that the jury officials were derelict in their duty. *Brandt* mentions the earlier case of United States v. Silverman, 129 F.Supp. 496 (D.C.Conn., 1955) and points to the complete non-feasance there existing. We think that when the jury officials have placed approximately 1800 names in the box—with many having previously completed questionnaires indicating their qualifications—the burden must rest upon those attacking the procedure to prove the non-existence of 300 "qualified" jurors. See also: United States v. Meyer, 113 F.2d 387, 395 (7 Cir., 1940), cert. den. 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459.

States, 19 F.2d 472, 475 (8 Cir., 1927). Cf. Tierney v. United States, 280 F. 322 (4 Cir., 1922), cert. den. 259 U.S. 588, 42 S.Ct. 590, 66 L.Ed. 1077, in which the court said that the right to an impartial jury is one of *rejection,* not selection.

 Lastly, we turn to plaintiff's contention that "the jury be a body truly representative of the community". Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Of course, this does not mean the particular jury selected for the trial of a particular case. It means, in effect, that the approximate 1800 prospective jurors must represent a fair cross-section of the community. Many of the occupations of the 91 jurors drawn for service during the period in question have been previously noted and this adequately demonstrates the many "walks-of-life" of the jurors as a whole. It is freely conceded that prospective jurors must be selected without systematic and intentional exclusion of any economic, social, religious, racial, political or geographical groups in the community. It may well be that the most acceptable procedure for accomplishing this end result will require the use of voter registration lists, or its substantial equivalent, but such was not a requirement at the time of this trial. No effort has been made to analyze the 1800 names for the purpose of determining their occupations. Plaintiff's argument, if any he has, must rest upon the disproportionate representation of Negroes whose cards (up until a few years ago) carried the letter "C".[13]

Plaintiff relies upon Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). In this case the Supreme Court held that the burden rested upon those attacking the procedure to prove the existence of purposeful discrimination, but once a prima facie case has been made out the burden shifts. While we cannot, with any reasonable certainty, ascertain the exact number of Negro names among the 1800 odd prospective jurors, without an exhaustive analysis of all names, we realize that 10% bearing the letter "C" on cards is indicative that this representation is not truly proportionate with the number of Negroes in the entire area. The vice in *Whitus* was that the names of jurors were selected from the old jury list, previously condemned by the Circuit Court of Appeals for the Fifth Circuit, and the 1964 tax digest made up from segregated tax returns, together with the personal acquaintance of the commissioners with persons in the community.

It is true that judges have been somewhat lax in constantly checking on juror representation. Judges appointed, following in the footsteps of their able predecessors, assume that the method of juror selection has been validly followed, including an adequate representation of Negro citizens. Until and unless there appears a decreased representation of Negro jurors actually appearing in court for service, there is hardly any need to suspect that the total number of names of Negroes in the jury box is disproportionate with the total community population. There have been instances in which 8 of the 12 selected jurors were Negro. Frankly, it was not until this case arose that the Court had occasion to attempt to compute the number of names of Negroes in the jury box and, as stated, this is not accurate for reasons heretofore noted. Nevertheless, it cannot be said that there has ever been any attempt of purposeful discrimination in jury selection, although it is probably true that it is more difficult to secure the names of prospective Negro jurors through the "key-man" system. The "at random" selection of jurors for the master wheel, if adopted by Congress, should eliminate any possible objection to past procedures but, as indicated above, the "key-man" system has heretofore received the endorsement of the Judicial Conference of the United States as it was generally considered that the latter system would result in more intelligent jurors finally serving on each panel.

---

13. These cards have now been rewritten to eliminate the letter "C", but this was not until after this case was argued.

In sum, the Court concludes that there was no constitutional defect in the jury selection process. As in many districts throughout the nation, it is not perfect. The famous Rabinowitz v. United States, 5 Cir., 366 F.2d 34, decision, with its many separate opinions, gives rise to much confusion. In the final analysis, the real reason for an attack upon the selection process in the present case rests on the simple fact that the 91 jurors were essentially defendant-minded. Overlooked is the fact that many jury panels selected from this same master wheel are predominantly plaintiff-minded. In neither instance is the Court at liberty to change this situation. The plaintiff's challenge to the array is denied.